**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF TEXAS**

**HOUSTON DIVISION**

United States Courts
Southern District of Texas
FILED

AUG 0 9 2017

David J. Bradley, Clerk of Court

GWENDOLYN P. WRIGHT

Plaintiff

against

Index No. 4:17-cv-01838

Defendant

THE COURTYARD BY MARRIOTT, LBAM INVESTMENT

GROUP, LLC, APPLE HOSPITALITY REIT, INC.,

PHILIP BARROCAS, MARY EWING, MARSHA CANNON,

BARBARA ISRAEL, LBA HOSPITALITY, FARRAH

ADAMS.


**Pauper's Oath and Motion**


I do solemnly swear (or affirm) that I have not any property, real or personal, exceeding $20, except such

as is by law exempt from being taken on civil process for debt; and that I have no property in any way

conveyed or concealed, or in any way disposed of, for my future use or benefit.

I.

The Plaintiff, Gwendolyn P. Wright hereby moves the Court to allow her to serve the Defendant  in Civil

Case 4:17-cv-01838 one copy, by certified mail, of the Claim and Amended Summary for Judgment to

the only known address of the Defendants, Philip Barrocas, Mary Ewing, Farrah Adams, ~~Mary~~

~~Ewing~~, Marsha Cannon, LBA Hospitality, LBAM Investment Group, and Apple Hospitality REIT to

address 2733 Ross Clark Circle, Dothan Alabama, 36302 and incur the expense of copying for each

individual person and corporation named in this claim.

II.

The Plaintiff moves the Court to demand the Defendant meet at the United States District

Court Southern Division, under supervision of the Court or Representative of the Court, to

view, copy, or photo the 200 documents of evidence submitted to the Court by the Plaintiff, incurring the

expense of travel and copying.

III.

The Plaintiff moves the Court to demand that the Defendant share the responsibility and incur the

expense of serving Defendant, Barbara Israel, a copy of the Claim and Amended Summary for

Judgement, who is no longer Employed by LBA, but had an intricate part and played a major role in

this claim, was employed during the Plaintiff's tenure at The Courtyard by Marriott, Shenandoah, Texas

and direct Supervisor of the Plaintiff, due to lack of information regarding her residency or workplace.

IV.

The Plaintiff moves the Court to allow these exceptions, due to the Defendant's failure to contact her and

being under the painful and humiliating necessity of soliciting pecuniary assistance in consequence of

being on Disability by which she was rendered incapable of retaining representation at the loss of

Employment at the hands of the Defendant.

## Certificate of Service

The Plaintiff hereby certifies that the Defendant was served this Pauper's Oath and motion on

*August 8, 2018* , by the Plaintiff.

Submitted by:
*Gwendolyn P. Wright*
Gwendolyn P. Wright
3018 Ribbon Creek Way
Spring, Texas 77389
832-894-5861

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

GWENDOLYN P. WRIGHT                              Index No. <u>4:17-cv-01838</u>

      Plaintiff

against

LBA HOSPITALITY, LBAM INVESTMENT

GROUP, LLC, APPLE HOSPITALITY REIT, INC.,

PHILIP BARROCAS, MARY EWING, MARSHA CANNON,

BARBARA ISRAEL AND FARRAH  ADAMS

## <u>PLAINTIFF'S AMMENDED MOTION FOR SUMMARY JUDGMENT</u>

NOW COMES plaintiff, Gwendolyn P. Wright, and pursuant to Rule 166a(i), submits the following

motion for summary judgment be issued on the merits of the entire claim <u>4:17-cv-01838</u>. The

Plaintiff moves with supporting evidence and documents for a summary judgment in her favor upon

all parts thereof. The Plaintiff requests that the judgment be rendered forthwith, with permission of the

Court, as there is no genuine issue as to any material fact and she, as the moving party, is entitled to

judgment as a matter of law on the issues as expressly set out in the motion. The Plaintiff requests that

summary judgment be based on uncontroverted testimonial evidence of witness statements and evidence

is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies.

## INTRODUCTION

The Plaintiff, Gwendolyn P. Wright, was employed as Bistro and Catering Manager at The Courtyard by

Marriott, Shenandoah, Texas. From the date of the opening of the hotel she successfully worked as both

line worker and Manager of the Bistro and continued in both positions throughout her tenure and

until she was forced to resign. The contract agreed upon and signed by the Plaintiff, was immediately

breached as it was stated that she would be hired as Bistro /Catering Manager only, and therefore,

civil rights discrimination and disability discrimination began at the onset of employment. The Plaintiff's

contract listed the job description as that of a Manager, yet she worked continuously as both Manager and

Bistro Associate in both capacities, as best she could, due to her department being understaffed at the

opening of the hotel and continued until she was forced to resign. On three separate occasions she was

hospitalized with painful Sickle Cell crisis and complications, due to exertion and stress from being

forced to work in both positions. The Plaintiff repeatedly requested reasonable accommodations of

regular time off and a full staff, which were never granted, causing her physical injury. The Plaintiff

suffered defamation due to accusations of simulating her disease and production of false and/or altered

documents in an effort to elude her job responsibilities and take time off, causing her mental injury. As

well, the Plaintiff was placed in and suffered incidents of physical harm and life-threatening physical

danger, one being reported to the Montgomery County Sherriff's from Defendant's landline telephone

system at the Courtyard by Marriott Shenandoah, Texas where she was employed. This incident was

witnessed by Food and Beverage Director, Mary Ewing and Regional Director of Sales, Chris Landry,

who at that time both directed and approved of the incident being reported to the authorities by night

2

Front Desk Associate, Rachal Calahan, notifying the entire staff of the physical threat and harm to the Plaintiff. This incident should have been reported, investigated and the outcome of the investigation shared with the Plaintiff, according to LBA policies and procedure in the LBA Handbook. To the Plaintiff's knowledge, no such incident was ever reported or an investigation conducted by anyone in authority and with the responsibility to do so. Due to the Plaintiff submitting many reports against this employee, prior to this incident and the Defendant's failure to follow their own rules and regulations concerning harassment, the Plaintiff was placed in life threatening situations which escalated, causing her both physical and mental injury due to stress and terrorism. mcsoopenrecords@mctx.org, Montgomery County Sherriff Department, 1Criminal Justice Dr. Conroe, 77301, Attn: Open Records. Evidence of the report can be readily attained and deemed uncontroverted as to the issue of this incident. Each document submitted by the Plaintiff has only one defect, which cannot be used as grounds for reversal, as the defect only serves to further prove that the documents submitted by the Plaintiff were retrieved from the Defendants own workplace, using the Plaintiff's username and password designated to her by LBA. The Americans with Disabilities Act of 1990 (**ADA**) prohibits discrimination and ensures equal opportunity for persons with disabilities in employment, State and local government services, public accommodations, commercial facilities, and transportation. The Persons With Disabilities Civil Rights Acts, under the section, "Racial Harassment" states, racial harassment is unwelcome conduct that unreasonably interferes with an individual's work performance or creates an intimidating, hostile, or offensive work environment. Examples of harassing conduct include: offensive jokes, slurs, epithets or name calling, physical assaults or threats, intimidation, ridicule or mockery, insults or put-downs,

3

offensive objects or pictures, and interference with work performance. An employer may be held liable for the harassing conduct of supervisors, coworkers, or non-employees (such as customers or business associates) over whom the employer has control. LBA Hospitality, LBAM Investor Group, Apple Hospitality REIT should be held liable for the harassing conduct of its executive, Farrah Adams, Directors, Philip Barrocas and Marry Ewing, Supervisors, General Manager, Barbara Israel and Acting G.M., Keith McCabe and Human Resources Director, Marsha Cannon, over whom they had control. The Plaintiff submitted over 20 complaints of disability and civil rights discrimination during a period of approximately five months. The Defendants acted both individually and combined to knowingly and intentionally, break the laws of the ADA and PWDCRA, by their refusal to take appropriate actions to protect the Plaintiff. It is the Plaintiff's belief that the Defendants had become familiar and comfortable in their actions, as directed by Human Resources Director, Marsha Cannon, not reply to any of the reports of discrimination in writing, or conduct any investigation, in an effort to avoid any disciplinary action or penalty for their actions, by stating that there was no proof, as carefully, practiced by Human Resources Director, Marsha Cannon herself. The Plaintiff spoke at length and in detail concerning each incident submitted as evidence with all of the parties named in each report, including details of off colored statements made by Philip Barrocas and Barbara Israel concerning their belief that the Plaintiff was, lazy, using her disability as an excuse not to do her job and that the Plaintiff did not even have the disability that she had placed on her application for employment, but was "faking" the disease because she was black and lazy". The Defendant Barbara Israel did indeed, know and understand the Plaintiff's disability, as she often bragged of her daughter being a doctor and having written a full and detailed report of Sickle Cell Anemia while in medical school. She also misused her knowledge of the

4

Plaintiff's disease by stating that she has a brother-in-law with the disease and that the Plaintiff was being

enabled by her doctors, but she was not having it. This belief and knowledge was used as the

basis to continue in her intentional, unlawful actions against the Plaintiff, knowing that stress and

exhaustion could indeed cause death, stroke or other complications. The defendants escalated in they're

intent to commit criminal actions against the Plaintiff by removing her personal documentation of the

conversations and incidents between herself and Philip Barrocas, Mary Ewing, Marsha Cannon and Chris

Landry. With this information in their hands, the Defendants committed criminal defamation by willfully,

knowingly and intentionally submitting sworn written testimony to the EEOC that was malicious, both

*expressed* and *implied*. Malice is expressed when there is manifested a deliberate intention unlawfully to take

away the life of a human being. The Defendants Philip Barrocas, Barbara Israel and Marsha Cannon

deliberately and intentionally and unlawfully attempted to take away the life of the Plaintiff by their failure to

apply information of her disability or use the known information of her disability, in the case of Barbara

Israel, to gain an understanding of how their actions were affecting her physical and mental health. The

defendants intentionally, maliciously and unlawfully committed crimes of bullying and harassment, knowing

the effects that it would have on any person, including themselves, who was in this position.  Malice is

implied when no considerable provocation appears, or when the circumstances attending the killing show an

abandoned and malignant heart. The Defendants, after many written and verbal reports of discrimination,

*continued in their course of actions and used these reports of the Plaintiff as evidence that their intended*

*actions were indeed proving to be successful in their unlawful acts and the intended outcome which was*

harm both physically and mentally to the Plaintiff, the pretext being that she would become so

overwhelmingly physically and mentally injured that she would be forced to resign.  In civil law cases, a

5

finding of malice allows for the award of greater damages, or for punitive damages. In English civil law (

the law of England and Wales), relevant case law in negligence and misfeasance in a public office

includes *Dunlop v. Woollahra Municipal Council* [1982] A.C. 158; *Bourgoin S.A. v. Ministry of Agriculture,*

*Fisheries and Food* [1986] Q.B. 716; *Jones v Swansea City Council* [1990] 1 WLR 1453; *Three Rivers*

*District Council and Others v Governor and Company of The Bank of England* [2000][11] and *Elguzouli-Daf v*

*Commissioner of Police of the Metropolis* [1995] 2 QB 335 in which Steyn L.J. found that malice could be

made out if the acts were done with an actual intention to cause injury. Malice could be shown if the acts were

done in the knowledge of invalidity or lack of power and with knowledge that it would cause or be likely to

cause injury. Malice would also exist if the acts were done with reckless indifference or deliberate blindness to

that invalidity or lack of power and that likely injury.  Civil tort law is that branch of law that deals with

breaches of civil duties, rather than a contractual duty or a general societal duty. The Plaintiff believes that

the Defendants are guilty of committing acts of breaches of civil duty to protect the Plaintiff and many acts

of negligence due to intentional actions, such as intentional infliction of emotional distress or violation of

the Massachusetts Civil Rights Act. The sheer number of ignored reports and complaints by the Plaintiff

concerning disability and civil rights discrimination, show the intentional and unlawful infliction of

emotional distress. As a matter of fact, the knowledge of Human Resources Director, Marsha Cannon of

the laws of employment and her responsibility to take action against her peers, Philip Barrocas and Mary

Ewing, prove intent and therefore, negligence. As well Marsha Cannon's knowledge and understanding

of employment law proves her guilty of intentionally allowing and causing the Plaintiff Tort injuries,

which are not limited to physical harm, they do also include economic, emotional, and even injuries to

her reputation.  The Plaintiff therefore is also seeking to recover damages for violations of rights, such

as property, privacy, or constitutional rights. The knowledge of the incidents reported to the Defendant, Farrah Adams, her attempt to protect the Defendants Philip Barrocas and Mary Ewing and her failure to take steps and report the actions of her peers, prove her intent to protect Philip Barrocas, Mary Ewing and Keith McCabe, proving intent and therefore, negligence. Had these reports by the Plaintiff been taken seriously, investigated and the outcome documented, the incidents would have stopped and the employees committing the acts of disability and civil rights discrimination, immediately fired. The fact that neither of the employees reported by the Plaintiff were never disciplined in any way, but were allowed to continue in their actions, until they either found other employment or in the case of Kathleen Dobson, who became so angry at the possibility of being finally disciplined, quit, proves intent and therefore, negligence. The Defendants committed criminal defamation by giving sworn testimony during a hearing with the Unemployment Officer, D. Mitchell, stating that the Plaintiff unlawfully acted by removing LBA property, which is a false statement. Within the binders removed, was evidence of emails with conversations between the Plaintiff and Philip Barrocas, reporting bullying, harassment, disability and civil rights discrimination, reports and logs with documentation of Plaintiff's reports of ongoing insubordination, breaching of LBA, state and federal laws and Phillip Barrocas' statements that the Plaintiff's duty was to get out into the community and pass out business cards in an effort to recruit employees for her department. This evidence would strengthen the Plaintiff's claim, so it would be more reasonable to understand that the Defendants are in possession of this crucial evidence or have knowledge of its whereabouts. The Plaintiff is aware that Criminal offenses may lead to incarceration in a jail or prison facility. However, for civil violations such as torts, as in the Plaintiff's case, the

7

Defendants may not be incarcerated. Therefore, the Plaintiff is requesting the Court to demand the punishment to take the form of monetary damages. Given the amount of evidence to support the Plaintiff's claim and the manner in which it was obtained, the Defendants have no real dispute as to what happened, where the injuries took place, the validity of the claim, the knowledge of the discrimination and their failure to adhere to the law. The Plaintiff moves that the Defendant cannot produce enough evidence to support its position, that the discrimination both disability and civil rights never occurred, or if it occurred, was not intentional. The Defendants cannot dispute the fact that LBA Hospitality, LBAM Investment Group, Apple Hospitality REIT (its subsidiaries) were aware of the actions of Farrah Adams, Philip Barrocas, Mary Ewing, Marsha Cannon, Keith McCabe, Linda Dewalt and Barbara Israel, who were all employed by and under their control. Disputing this fact will only serve to prove that Sr. Sales Director, Chris Landry and Sr. Vice President, Farrah Adams, as executive leveled employees, working in direct contact with Larry Blumberg himself, under his control, failed to uphold the laws of LBA, as well as state, federal, ADA and PWDCRA. The Plaintiff moves that there are no material factual issues remaining to be tried, therefore moves the Court to agree that judgment be entered in her favor.

<u>STANDARD FOR REVIEW</u>

The Plaintiff is entitled to summary judgment when the evidence presents no genuine issue of material fact and she is entitled to judgment as a matter of law. *Adickes v. S. H. Kress & Co., supra.* Pp. 477 U. S. 323-326. The Plaintiff is entitled to summary judgment in this case because all evidence submitted was acquired and assembled from the Defendant's office location, with the use of the business' in-house computers, and the Plaintiff's assigned user name and password by LBA

8

Hospitality and issued by LBA Human Resources department representatives. Plaintiff submits this request for summary judgment in accordance to the legal laws of Fed. R. Civ. P. 56.

FACTS

1.

Evidence submitted to the Court, verifies a clear and accurate timeline of all incidents, which led to the Plaintiff's forced resignation, including Defendant records, Handbook, reports and sworn *written testimony, after she was no longer employed at The Courtyard by Marriott Hotel.*

**(Exhs. A-E and 1-90)**

2.

Evidence submitted to the Court, verifies that Plaintiff followed the laws of LBA Hospitality Associate Handbook's General Policies and Procedures, under the section, Persons With Disabilities Act Policy Statement, bulleted point, Reporting Harassment and Discrimination, which states, "The company encourages associates to come forward to report any form of harassment or discrimination as soon as possible. Do not wait for the situation to become a pattern of severe or pervasive conduct", by immediately and repeatedly reporting the discrimination, through the chain of command, in an attempt to stop the discrimination and get help, without legal intervention. **(Exhs. 1-53f. & 88)**

3.

The Defendant failed to adhere to its own General Policies and Procedures, under the section, Persons With Disabilities Act Policy Statement, bulleted point, Reporting Harassment and Discrimination, which states, "All complaints of harassment and discrimination will be taken seriously and investigated thoroughly. If appropriate, disciplinary action will be taken against the harassing party, up to and including termination of employment. The person who filed the complaint will be advised of the results of the investigation and of any action taken", by failing

9

to take the repeated complaints of the Plaintiff seriously, as evident in their ignoring all of her complaints, of failing to conduct a thorough investigation of any complaint, failing to appropriately take disciplinary action against the harassing parties, failing to advise the Plaintiff of the results of any investigation of any of her complaints and any action taken either verbally or in writing and evidence has been submitted to the Court. **(Exhs. 1-53f. & 88)**

4.

The Defendant failed to adhere to its own General Policies and Procedures, under the section, Persons With Disabilities Act Policy Statement, bulleted point, Reporting Harassment and Discrimination, which states, "Associates, supervisors and managers must also report any incident of harassment or discrimination when they may observe or have knowledge of, even if they are not the target or victim of such harassment. Such reports will be handled in the same fashion as complaints by victims", by Defendants, Marsha Cannon, Human Resources Director, Mary Ewing, Food and Beverage Director, Philip Barrocas, Regional Director of Openings, Barbara Israel, Hotel General Manager, Farrah Adams, Sr. Vice President Hospitality and Chris Landry, Regional Director of Sales, failure to report the witness, knowledge and observance of the repeated reports by the Plaintiff of harassment and discrimination, by subordinates and by each of their peers and evidence has been submitted to the Court. **(Exhs. 1-53f. & 88)**

5.

The Defendant failed to adhere to its own General Policies and Procedures, under the section, Employment Compensation, bulleted point, Wage and Hour Compliance of the Handbook, which states, "The company will not make deductions which are prohibited by the FLSA from its salaried exempt associates' pay. If any associate feels that an improper deduction from pay has been made,

10

please contact the Human Resource Hotline at (866) 509-5807. If an improper deduction has been made, the company will provide appropriate reimbursement", by Defendant, Marsha Cannon, Human Resources Director, knowingly and/or intentionally directing the deduction of pay from the Plaintiff's salary during hospital stays and refusing to reimburse her, after repeated requests by phone number given in the LBA Hospitality Associate Handbook and Plaintiff has submitted evidence to the Court. **(Exhs. 79-84 & 88)**

6.

Evidence of the Plaintiff's actual days, dates and hours of work can be verified by the retrieval of her Micros key card record, housed in the Human Resources Department of LBA Hospitality, Directed by Defendant, Marsha Cannon. The Defendants will argue that the Plaintiff was hired as a salaried employee, therefore agreed to work when needed. Yet, unlike any other Manager or General Manager at the hotel, she worked seven days a week most weeks, morning and evening shifts, approximately 14-16 hours a day, some days without being allowed to go home between shifts, to complete the work that Bistro employees did not compete, during both Thanksgiving and Christmas holidays as the only Manager on duty at the entire hotel and supervised all departments in any needed direction or tasks. Plaintiff will submit a motion for discovery for records of her Micros Key Card to the Court and evidence will be submitted of actual work hours of the Plaintiff during her tenure at the Courtyard by Marriott Shenandoah, Texas. **(Exhs. 50 & 85-87)**

7.

The Defendant failed to adhere to its own General Policies and Procedures, under the section, Company Equipment and Property, bulleted point, Use of Company Computers, which states, "The Company harassment and discrimination policy also applies to E-mail communications and any questions about this policy should be addressed to the General Manager", by Defendant, Barbara Israel, prohibiting the Plaintiff from the use of company computers to report incidents of harassment

11

and discrimination to Human Resources Director, Marsha Cannon, after many complaints had

previously been reported by Company E-mail and the removal of documentation and emails of the

Plaintiff's personal use, which would validate even further her claims of discrimination. In an attempt

to silence her, the Defendants, Marsha Cannon, Philip Barrocas, Mary Ewing and Barbara Israel all

conspired to intentionally remove any evidence of their knowledge and participation, in an effort

to weaken any claims of discrimination. **(Exhs. 53-53f.)**

8.
The Defendant failed to adhere to its own General Policies and Procedures, under the section,

Associate Performance Expectations, section, Rules of Conduct, by allowing, coercing, directing

and/or participating in the following:

- Breach of trust or dishonesty
- Immoral, immature, or indecent conduct; soliciting persons for immoral purposes; or the aiding and/or abetting of any of the above.
- Evident and reported disrespectful conduct and behavior of subordinates and superiors.
- Violent and disruptive behavior reported to include: coercion, intimidation, threats against a fellow associate, or reports of the Plaintiff's subordinates' failure to give a high degree of service or courtesy to any guest.
- Theft or misappropriation of Company property, or unauthorized removal of any of the above, which included the Plaintiff's Food and Beverage binder, which had state and federal mandated daily, monthly and annual logs, charts, time sheets, etc.
- Willingly or habitually ignoring the Plaintiff's reports of subordinate violations of safety, health,
- LBA, Marriott, state and federal laws, rules and regulations.
- Making or publishing false, vicious or malicious statement concerning the Plaintiff.
- Failing to observe civil defense rules or common safety practices; or failing to report unsafe action of other associates to appropriate leadership.
- Ignoring the Plaintiff's repeated reports of subordinates discussing personal or unauthorized Company matters in public areas where guests could overhear conversation.

12

- Any conduct deemed inappropriate, unethical, immoral or contrary the rules and regulations in the LBA Hospitality Associate Handbook.
- Failure to adhere and to prohibit the rule in the LBA Hospitality Handbook which states, "Emergency situations or those verifiable situations beyond an associate's control may be exempt from this policy at the discretion of the General Manager. **(Exhs. 1-90 & A-D)**

The Plaintiff has submitted evidence of all of the above bulleted points to the Court.

9.

The Defendants failed to recognize its own policies and procedures by definition in the LBA

Handbook, under the Family and Medical Leave Act (FMLA), Number 3, Definition of Serious

Health Condition, which defines such health condition as, <u>an illness, injury, impairment, or</u>

<u>Physical or mental condition involving:</u>

- Any incapacity or treatment connected with inpatient care in a hospital, hospice or residential medical care facility.
- A period of incapacity requiring absence of more than three consecutive calendar days that also involves continuing treatment by a health care provider; or
- Any period of incapacity (or treatment therefore) due to a chronic serious health condition, such in the Plaintiff's case, Sickle Cell Anemia.

by forcing the Plaintiff to drive herself to the emergency room, placing her life in life threatening

danger, due to heart palpitations, that took place on the business' property, after being called into the

Defendant, Barbara Israel's, office and being threatened, yelled at, demeaned, called out of her name,

mocked and bullied by Barbara Israel, by refusal of Defendant, Barbara Israel to assist the

Plaintiff or allow Assistant General Manager, Melissa Castro to assist her in an emergency

situation and by harassing the Plaintiff while at home under doctor's care. The Plaintiff has

submitted evidence to the Court. **(Exhs. 44-44a.)** The Plaintiff will submit a motion for discovery for

the hotel's video of the night in question, February 6, 2015 approximately 22:18 at the hotel's main

entrance and front car porch, which will clearly show the Plaintiff going to her car which was parked

right outside the front door to the left, and could be clearly seen by the parking lot camera of the

13

hotel and the Defendant, Barbara Israel following her outside, and yelling at her. The Defendants will argue that the incident in question took place long ago and therefore the video has since been deleted, which will only prove that they were not interested in finding out the truth, or otherwise are attempting to protect themselves against the Plaintiff's claim, by destroying such pertinent evidence, which clearly shows the Plaintiff crying, barely being able to move and driving off of the hotel parking lot, stopping at the end of the driveway to try and call her family before pulling off.

10.

The Plaintiff's support system, Defendants Philip Barrocas, Regional Director of Openings, Mary Ewing, Food and Beverage Director, Marsha Cannon, Human Resources Director and Barbara Israel, General Manager, regularly received reports of discrimination and harassment from the Plaintiff from the start. Defendants admitted on April 28, 2015 that "things did not go well from the start and that during the period of Ms. Wright's employment", the Bistro did not function well under this support system and evidence has been submitted to the Court. **(Exhs. 63c. & 63d.)**

11.

Defendants admitted that on January 3, 2015, during a telephone conversation with Human Resources Director, Marsha Cannon, the Plaintiff's immediate response to allegations of her not meeting job standards, was that she was being discriminated against and that she was being bullied, as previously reported by the Plaintiff on many occasions and evidence has been submitted to the Court. The Defendants' statement here is valid, proving that the Plaintiff never once diverted from her claim of discrimination. Defendant, Marsha Cannon gave sworn written testimony outlining and giving great detail of the incidents surrounding the Plaintiff's tenure at The Courtyard by Marriott Hotel. However, she failed to mention any of the reports and complaints made by the Plaintiff and in fact, stated that she could not remember the details of conversations with her. Evidence of the

13

Defendants' own sworn testimony verifies that the Plaintiff had indeed spoken with Marsha Cannon in detail of the situation at the hotel and that she did indeed have knowledge of the ongoing reckless discrimination, proving defamation, malice and negligence. The Defendants sworn written testimony also proves willingness to ignore the Plaintiff's reports of discrimination, knowledge of the reports, failure to adhere LBA and state laws, ADA and PWDCRA, intent to break the laws of each of these stated and conspiracy to constructively fire the Plaintiff. **(Exhs. 63f. - 63i.)**

12.

The Plaintiff was never given any statement or outcome of any investigation of any complaint Reported to Human Resources Director, Marsha Cannon, either in writing or by verbal communication and the Plaintiff will enter a motion that any such investigations or outcome of any investigations be submitted to the Court by the Defendants, including dates and times these reports were completed and date and time and method, which knowledge of or copy given to the Plaintiff.

13.

The Plaintiff has submitted documented evidence of race and disability discrimination and hostile work environment to the Court as related to misconduct. **(Exhs. 41a. & 41b., 45-45a. - 45c.)** The Defendant will argue that although discrimination may have taken place in the case of the Plaintiff, race had nothing to do with it. Sickle Cell Anemia affects persons of color, which is a very well-known fact all over the world. The Defendants did not have to make actual statements using derogatory words, such as "nigger" or the likes thereof. The racial discrimination is there and the fact that the Defendants committed such acts with the knowledge of the Plaintiff's disability from the beginning, further prove they're willingness to overlook her complaints or take them seriously. The fact that they hired a person of color in a managerial position has no bearing,

14

given the facts that they failed to protect her, created an egregious environment intentionally, stated and admitted to having professional knowledge of her disability and still, directed, coerced, allowed and participated in the racial discrimination.

14.

The Defendant argues that the Plaintiff only complained to Human Resources after she received the Performance Improvement Plan, and she has submitted evidence of over forty (40) complaints reported of insubordination, discrimination and harassment prior to December 10, 2014 to the Court. **(Exhs. 1-41c.)** The Defendants failure to investigate or act on either of the Plaintiff's complaints, proves constructive dismissal, malice, negligence and intent to break the laws of LBA, state, ADA and PWDCWA. The Defendants statements that the Plaintiff in any way failed to meet her job duties and/or description, prove defamation and slander.

15.

The Plaintiff's complaints of discrimination and continued harassment, after the resignation/termination of Acting General Manager, Keith McCabe, were reported against Regional Director of Openings, Philip Barrocas, Food and Beverage Director, Mary Ewing and General Manager, Barbara Israel to Human Resources Director, Marsha Cannon, and are protected under Title VII of the Civil Rights Act of 1964, a federal law that prohibits employers from discriminating against employees on the basis of sex, race, color, national origin, and religion. It generally applies to employers with 15 or more employees, including federal, state, and local governments and Plaintiff has submitted evidence of these complaints to the Court. **(Exhs. 44-53f.)** The Defendant, Marsha Cannon, knowingly and intentionally broke all of these stated laws and in fact, directed her peers in doing so, by failing to report them, allowing the actions to continue, trying to cover up their actions as

15

well as her own and later, giving sworn written testimony regarding the incidents that caused both

physical and mental injury to the Plaintiff by her peers and colleagues, Philip Barrocas, Mary Ewing

and Barbara Ewing.

16.

The Defendant argues that the Plaintiff was ineffective in her directives to her subordinates

and therefore, should be held responsible for the failure of the Bistro performance, therefore, the

Plaintiff has submitted evidence of her continuous attempts to train associates to adhere to LBA

Company policies, follow state and federal laws, and refusal of subordinates to follow directive

of both LBA, and state laws and the Plaintiff to the Court. The Defendants have in their possession

logs and charts that would prove criminal defamation and the Plaintiff will submit a motion for

discovery to the court. **(Exhs. 1-53f. & 90 pgs. 1-17)** The Plaintiff understands that this claim is not

Criminal but Civil and therefore is asking that compensation be rewarded by the Court in monetary

damages.

17.

The Defendant refused to investigate repeated complaints of insubordination of Bistro staff

and could not produce evidence of the Plaintiff's fault or responsibility for the failure of the Bistro

during the conference on December 10, 2014, with Acting General Manager, Keith McCabe and

Regional Director of Openings, Philip Barrocas (by phone). The Plaintiff submitted evidence of the

Defendant, Philip Barrocas, refusing to give a copy of the Performance Improvement Plan, in which

the Plaintiff showed that she was signing under duress and fear of loss of employment to the

Court. **(Exhs. 37, 38 & 39)** This evidence proves that Human Resources Director, Marsha Cannon,

Regional Director of Openings, Philip Barrocas, Food and Beverage Director, Mary Ewing and

Acting General Manager, Keith McCabe, did indeed conspire to constructively fire the Plaintiff.

16

The evidence proves willingness of both Philip Barrocas and Marsha Cannon, to do whatever it took to get rid of the Plaintiff, including break LBA laws as stated by Defendant, Barbara Israel. As well, this validates the Plaintiff's claim of malice.

18.
The Defendant submitted a false statement, alleging that the Plaintiff stated that Acting General Manager, Keith McCabe, was the reason for her forced resignation and Plaintiff has submitted as evidence, a copy of her resignation letter, stating forced quit, bullying, harassment and discrimination. The letter also, speaks of the Plaintiff's confidence in her overall work performance. The letter never makes mention of Keith McCabe at all but in fact states disrespect, downright bullying, enduring more than anyone should have been expected to, hardship that she went through at the hotel, great physical and emotional pain caused by the Defendants and being forced to resign. **(Exh. 56)** The Defendant's statements prove their intent to cover up the actions that they took against the Plaintiff, validating her claims of constructive firing, defamation, malice, intent to break the law and negligence.

19.
The Defendant argues that the Plaintiff complained of General Manager, Barbara Israel's questioning of her work performance, giving the G.M. start date. Evidence submitted to the Court lays out a clear and accurate timeline of all incidents and actions reported by the Plaintiff, regarding the Defendant, Barbara Israel, including harassment while she was at home, under doctor's care. **(Exhs. 43-77e., 89, pgs 1-12 & 90 pgs. 1-17)** The Defendants will argue that Barbara Israel acted on her own, but this can be easily disputed as she gave sworn written testimony that Philip Barrocas and Mary Ewing did indeed, direct and coerce her to constructively fire the Plaintiff and in fact participated in the acts and it is evident that this was done along with Marsha Cannon and Farrah Adams' approval and knowledge.

17

The Plaintiff adhered to LBA Policies in the Handbook by not waiting until the situation escalated.

20.
The Defendants' own words stand to testify against them, as evidence of the overall leadership style in a statement submitted, "Incredibly, Ms. Wright states in the charge that there was no proof of poor performance", as taking on a demeaning and mocking nature, yet failing to share any of the responsibility of the failure of the entire hotel's performance from the onset of its opening and which continued during the Plaintiff's tenure, under the leadership of Philip Barrocas, Mary Ewing, Marsha Cannon and Barbara Israel and afterwards. The Plaintiff has submitted evidence to the Court. **(Exh. 631.)** The Defendant's character and overall attitude towards the Plaintiff becomes very evident, clear and concise in their statements about her. The statements given in sworn testimony were very demeaning, negative, charged with slander, defamation and clearly show they're attempts to cover up their wrong doings. The Defendants had to have read and approved of all of the statements made by their council, who in fact was making those sworn statements on their behalf. The Defendants never mentioned or admitted the Plaintiff's overall approval rating by all other employees of the hotel, the fact that she out performed every other manager at the hotel or that she never received not one complaint against her, even though she was enduring such hardship as disability and civil rights discrimination.

21.
The Defendants argue that the Plaintiff's department failed the Quality Control Assessment, but failed to state that the entire hotel failed with an overall score of 69.9%, with the Bistro and the Plaintiff scoring highest in the entire hotel and Plaintiff has used the Defendant's own Q.C. report as evidence to testify against them and submitted it as evidence to the Court. **(Exhs. 43-43h.)**

18

The Defendants failure to make this very crucial distinction in the Q.C. report, proves malice,

defamation and negligence.
22.
The Defendants argue that the Plaintiff's department failed the Quality Control Assessment, but

failed to state that the Bistro was understaffed from the opening of the hotel and remained understaffed

throughout the Plaintiff's tenure, as well as suffered greatly due to Bistro staff refusing to follow LBA

Refreshing Business rules, Marriott Training, state, federal and OSHA standards repeatedly, causing

she and one other worker to do the work of 5 1/2 people, yet still managing to score higher than any

other department at the hotel that was fully staffed. The Defendants failed to state or admit that from

the onset of her tenure at the hotel, the Plaintiff submitted many complaints of Bistro staff and they're

insubordination.  As well, during this time, the Defendants, Marsha Cannon, Mary Ewing and Philip

Barrocas all had knowledge that the Plaintiff needed surgery on her left arm, as a result of being forced

to perform the duties of a line worker, day after day, lifting, pulling, dragging, etc., heavy boxes and

equipment, yet in loyalty to LBA, re-scheduled the surgery and opted for medications to alleviate the

pain instead. The Defendants in fact, had knowledge and approved of Barbara Israel forcing the

Plaintiff to perform the duties of Maintenance by grouting the entire Bistro kitchen floor, proving

disability, civil, racial discrimination, malice, negligence and constructive firing.

**(Exhs. 2,7,10,14,15,17,19,26,28,29,35 & 5)**
23.
Employee, Rachel Calahan, Front Desk and Night Audit Associate, gave sworn written

testimony of the knowledge and witness of Defendant, Barbara Israel, discriminating against the

Plaintiff, having knowledge of the Plaintiff's disability, using off-colored statements about the

Plaintiff's disability and evidence has been submitted to the Court, as proof of race discrimination.

19

The Defendant, Barbara Israel submitted sworn written testimony that she never requested that the Plaintiff bring proof of her disability and doctor's note to the hotel, before she returned to work and that she never made any comments about her illness, yet later disputed her own statement, by submitting another sworn written testimony admitting that she and Phillip Barrocas had conversations about the Plaintiff's disability, had knowledge of her disability, believed that she was simulating her illness and in fact that LBA was still in the process of trying to prove that she was not ill at all, proving defamation, discrimination, malice, negligence, slander and the attempt to cover up her own involvement in the discrimination by trying to remove her responsibility to the actions she herself took against the Plaintiff. **(Exhs. 59, 60 & 75-75b.)**

24.
All Managers and employees in leadership positions at the hotel's date of opening have either resigned or were terminated and gone to work for other hotels or hotel chains outside of the LBA control, including Barbara Israel, who gave sworn written testimony on the Plaintiff's behalf. The Defendants will argue that this has no bearing on the Plaintiff's case but in fact shows the overall failure and leadership disparity in comparison to other hotels and/or chains, to that of Philip Barrocas, Farrah Adams, Mary Ewing, Marsha Cannon and Barbara Israel, who were under the control of LBA Hospitality, LBAM Investment Group and Apple Hospitality REIT.

25.
Plaintiff submitted an Admission Statement to the Court with seventy-eight (78) requests for admission, including documents of evidence to support each and every request. The Plaintiff, in this amended summary for judgment, has submitted ninety (90) documents of evidence in her claim. **(Exhs. 1-90 pgs. 1-17)**

20

26.

Plaintiff was contacted by the Defendant, Barbara Israel who offered to and submitted sworn

testimony of the Plaintiff's innocence, naming Philip Barrocas, Mary Ewing and Marsha Cannon as

the parties who conspired to unlawfully constructively discharge her. The letter verifies that in

certain situations, Defendant, Philip Barrocas, coerced her to participate and in certain situations,

Defendant, Mary Ewing, directed her to participate in the constructive firing of the Plaintiff.

Testimony of the Defendant, Barbara Israel was submitted voluntarily on her own will to a

state agency who enforces state and federal laws for the state of Texas, on the date of Plaintiff's

Unemployment Hearing, June 15, 2015 and the Plaintiff has submitted the written testimony of this

Defendant and requested the transcript of that hearing.  Plaintiff will submit the DVD as further

evidence to the court. **(Exhs. 75-75c.)**

27.

Plaintiff submitted evidence of hospitalizations due to painful Sickle Cell crisis that she suffered

while employed at the Courtyard by Marriott Shenandoah which fall within the timeline given in her

complaint, that are true and accurate to the Court. There is in no way that the Plaintiff could have

successfully simulated a painful Sickle Cell Anemia Crisis, as stated by the Defendant and any

dispute to these documents will suggest that the hospital staff of Hermann Memorial the Woodlands

Hospital, indeed conspired along with the Plaintiff to commit a criminal act, further proving the

Defendant's intent to continue in their acts of discrimination until the Plaintiff was forced to

quit and continued afterwards in an effort to cover up their wrong doing, validating malice and

negligence. This also proves to what extent the Defendants are willing to go to protect themselves,

proving intent. **(Exhs. 61-61a., 42-42a., 75c-75d.)**

21

28.

Plaintiff submitted evidence of her E.R. visit due to heart palpitations and life-threatening stroke

as well as, documents supporting her claim of mental injury that are true and accurate to the Court.

The Defendant, Barbara Israel sent a text to the Plaintiff, after her forced resignation, stating that LBA

was still trying to prove that she was not sick at all, which suggests that the Plaintiff could have in

some way either simulated heart palpitations and/or that the hospital staff of Hermann Memorial the

Woodlands Hospital, indeed conspired along with the Plaintiff to commit a criminal act, further proving

the Defendant's intent to cover up proof of the Plaintiff's claim. The Defendants will argue that Barbara

Israel acted on her own by defending of the Plaintiff and will use the fact that she too was terminated,

as motive, further proving that neither Philip Barrocas, Mary Ewing, Marsha Cannon or Farrah Adams

had any goodwill or heart towards any employee in whom they deemed a possible threat against the

on-going discriminatory practices that no doubt plague LBA. **(Exhs. 61-61a. & 76-76f.)** The

Defendants will argue that one hospitalization suffered by the Plaintiff entered as evidence, happened

after she was no longer employed by them, therefore, they should not be held responsible for this

hospitalization. The Plaintiff has submitted within this request for summary judgment, names, address,

phone numbers, medical degrees, studies and research, of doctors who specialize in Sickle Cell Anemia

and the study of hematology, who are willing to give expert testimony and facts, as expert witnesses on

behalf of the Plaintiff as to the cause, physical effects and continued mental and physical effects of

stress in Sickle Cell patients, such as the Plaintiff, proving physical and mental injury continued, after

she was forced to resign.

22

29.

All evidence submitted by the Plaintiff falls within the timeline of incidents, complaints and

injuries that she suffered while employed at The Courtyard by Marriott, Shenandoah, Texas to the

Court are true and accurate, uncontroverted and have no issue of validity.

30.

Plaintiff submitted evidence of her ongoing mental injury after she was forced to resign,

causing her to contemplate suicide that is true to the Court. Due to acute depression, the Plaintiff

spent many hours, days, weeks, months contemplating death by suicide. The Defendant will argue

they in no way are responsible for the Plaintiff's mental injury, yet reports submitted to the Courts as

evidence of the Defendants' knowledge of her mental state on several occasions, stating that she was

not eating or sleeping, not being given a fair chance and that she felt that she was in a no winning

situation and the knowledge of the Plaintiff being placed in a life-threatening situation, not to mention,

the continuance of bullying, harassment, demeaning, defamation and intentional emotional stress that

she suffered, cannot be deemed mentally safe by any reasonable person. **(Exhs. 1-77c.)**

31.

Plaintiff submitted evidence of cell phone texts between herself and Defendant, Barbara Israel, as

evidence of harassment of the Plaintiff while ill and under doctor's care and emails to the Defendant,

Philip Barrocas, as evidence of the knowledge of both Defendants of the Plaintiff's disability and

awareness of the race discrimination and harassment that the Plaintiff suffered during her tenure to

the Court. **(Exhs. 45-45c.)** The Defendant will argue that although harassment cannot be disputed,

racial discrimination is only implied. However, the Defendants Philip Barrocas and Barbara Israel

both were aware of the Plaintiff's disability at the onset of her employment, had time to look into the

allegations that she continued to report, had the responsibility to get an understanding of her

disability with the use of information gathered and the knowledge of the disease by Barbara Israel

and act accordingly. It is a well-known fact that Sickle Cell Anemia is a disease that effects persons of color, therefore proving, racial discrimination was committed against the Plaintiff. The Defendant will argue that Philip Barrocas himself, is a person of color and would not knowingly commit racial discrimination, yet as a person of color himself, Philip Barrocas had the civil responsibility to follow the law and protect the Plaintiff. The fact that he did not, proves negligence, malice and intent.

32.

Plaintiff submitted evidence of harassment and bullying by her subordinates and superiors to the Court. Over one-hundred, four documents of evidence of her claim were submitted in the first request for summary judgment. In this amended request, the Plaintiff has submitted over 200 documents of evidence to the Court. The Defendants Mary Ewing and Marsha Cannon will argue that although they had conversations with the Plaintiff about her disability, the actions taken to protect her did not warrant any disciplinary action or dismissal of any of the parties in the reports. However, both Mary Ewing and Marsha Cannon asked the Plaintiff to explain Sickle Cell Anemia, in which detailed information of the cause and effects, including the fact that stress was one of the major factors that exacerbated the disease was shared with them. This known fact was proven during the Unemployment Hearing of the Plaintiff, where each Defendant can be heard refusing to admit that the situation at the hotel was in any way stressful. The Defendants either already knew the effects that the discrimination was having on the Plaintiff, or took the time to gather information about the disease, in an effort to defend themselves, which could have and should have been done during the Plaintiff's tenure, and the appropriate actions taken to stop the discrimination, proving malice and negligence and intent.

24

33.

Plaintiff submitted evidence that the workplace had become so hostile and egregious that any reasonable person would have resigned from their position to the Court. The Defendants will argue that they in no way created a hostile workplace or that the Plaintiff's workplace was egregious or harmful in any way. Evidence submitted to the Court proves that the Defendants are not being truthful and otherwise, knowingly and willingly, with ease, without remorse, with no respect for the law, void of compassion or humanity, intentionally and knowingly discriminated against the Plaintiff, with the intent to harm her both physically and mentally, in an effort to force her to resign. The Defendants failed to show any morals or civil responsibility towards the Plaintiff throughout her tenure at the hotel, yet argue that the Plaintiff was given time off to care for herself while she was in the hospital in sworn written testimony, given by Tracey Whiddon, Human Resources Coordinator for LBA, who is supervised by Defendant, Marsha Cannon. **(Exhs. 74)**

34.

Plaintiff submitted evidence to the Court that Sr. Vice President of Hospitality, Farrah Adams, had knowledge to the seriousness and unlawfulness of the ongoing complaints of discrimination and harassment and stated to the Plaintiff, "Thank you for this information, you will be hearing from someone". The acknowledgment of the Defendant, Farrah Adams, verifies that the Plaintiff had made continuous reports according to LBA policy of discrimination, before contacting her. The email shows lack of interests or compassion in any way, was cold and unfeeling and did not have any words of comfort or any element of surprise. Farrah Adams immediately passed the buck by removing herself from the situation and ignoring her responsibility to intervene or to report the discrimination being suffered by the Plaintiff at the hands of her peers, proving that the Defendants

25

had indeed shared with her what was taking place at the hotel regarding the Plaintiff. Plaintiff

will request the report and outcome of the investigation of the complaint sent by Farrah Adams,

including day, date and time, the person that the report was sent to and day date and time that the

Plaintiff did indeed hear back from anyone regarding this incident and will submit it to the Court as

evidence. The Defendant will argue that although the knowledge of the discrimination against the

Plaintiff was shared among Farrah Adams, Philip Barrocas, Mary Ewing, Marsha Cannon and

Barbara Israel, the owner of LBA, Larry Blumberg should not be sued or held responsible for

their actions. Each of the Defendants worked in direct contact with both Farrah Adams and/or

Larry Blumberg and are under his control, removing the argument and otherwise proving that

Larry Blumberg either knew and participated and approved of the actions being taken by his

Executive and Senior employees, or that he himself was negligent in not caring about what was

taking place, after Philip Barrocas had prior claims against him, or otherwise himself had become

comfortable in the acts of discrimination and the belief that all evidence had been taken from the

Plaintiff

35.

Plaintiff has entered a motion for the date and time of Visiting Regional Sales Director, Chris

Landry, to The Courtyard by Marriott Shenandoah, including any reports or investigations and

outcome of that investigation, should include the day, date and time which Chris Landry submitted

this report and the day date and time the Plaintiff was given a copy, including any information of any

such investigation was shared with her. The Plaintiff will submit any such report to the Court as

evidence, along with the report given the Montgomery County Sherriff's Department from the hotel.

36.

Plaintiff submitted to the Court, evidence of the Defendant, Barbara Israel, hiring part-time Bistro

associate, Antonia (Kiana) Bragga, without proper identification, certification or training and forced the Plaintiff to work under her and take directives from her during a major catering event after the associate had only been employed, being hired by Defendant, Barbara Israel, for four days. The Defendant will argue that Barbara Israel acted on her own in breaking the laws of LBA and state by hiring Kiana and that they had no knowledge of this situation. However, the Defendant states that Food and Beverage Director, Mary Ewing made two visits to the hotel to train the Bistro Manager and it is reasonable to think that just as with all other reports of breaches of the law, the Plaintiff reported this Incident to Mary Ewing as well. Mary Ewing knew of this situation and in fact, directed Barbara Israel to do whatever it took to get rid of the Plaintiff, as stated in the sworn written testimony given by her on the Plaintiff's behalf. **(Exh. 51)**

37.

Defendant, Marsha Cannon, Human Resources Director, submitted an email to Council for the Defendants in the Unemployment hearing, Elizabeth B. Glasgow of Farmer, Price Hornsby and Weatherford and another Executive employee, Rob Dietrich, giving them knowledge of the Plaintiff's ongoing discrimination, before the Plaintiff was forced to resign from her position, verifying that the Defendant had knowledge and awareness of the seriousness and unlawfulness of the ongoing discrimination and harassment that the Plaintiff had suffered and continued to suffer, as she was still at that time employed at The Courtyard by Marriott Hotel Shenandoah. Marsha Cannon proved that she did then and does now, know and understand the rules of employment and LBA law and therefore, intentionally and knowingly participated in the acts of discrimination, proving malice. The Plaintiff has submitted evidence to the Court. **(Exh. 54)** This email verifies that the Defendants indeed knew and understood that they had discriminated against the Plaintiff and were in fact already in contact with an attorney, in an effort to come up with a defense against this claim, proving malice, intent and

negligence.

38.

During the Plaintiff's Unemployment Hearing, every Defendant in attendance (by phone),

Philip Barrocas, Regional Director of Openings, Mary Ewing, Food and Beverage Director, Marsha

Cannon, Human Resources Director, stated under sworn oath, that the circumstances surrounding the

Plaintiff's claim was not in any way stressful to either of them, therefore the incidents reported by the

Plaintiff could not have caused her stress, causing her to suffer in any way the painful Sickle Cell Crisis

or heart palpitations stated in her claim. The Plaintiff has requested the transcript of the hearing from the

Unemployment Office and will submit as evidence to the Court. The Plaintiff has submitted evidence

of over 50 emails of reports, complaints, concerns and statements of discrimination, harassment,

bullying, threats of violence, insubordination, breaches of state, federal and LBA laws and legal

regulations as evidence of the stressful, hostile and egregious workplace environment at The

Courtyard by Marriott Shenandoah, Texas under the failed leadership, failed support, failed

acknowledgement and failure to take any action or responsibility by Philip Barrocas, Barbara

Israel, Mary Ewing, Farrah Adams and Marsha Cannon.

39.

The Defendant will argue that they did not write the Plaintiff up, although she was not meeting

her job requirements, in an effort to somehow seem compassionate, yet she was placed on PIP, without

reasons being explainable and the attempt to cover up the act by refusal to give her a copy of the

PIP. The Defendant has taken the stand from the beginning that the Plaintiff was responsible for the

failure of the Bistro, yet never gave any verbal or written warning, stating any specific failure on

her part that could be proven or presenting any complaints from any Bistro employee under her

28

supervision, including those that she reported many times of bullying and harassment, any other hotel

employee in any department, any other hotel Manager, including Mary Ewing, Food and Beverage

Director, any hotel guest, specifically naming the Plaintiff in the complaint or any vendor that the

Plaintiff worked with, including the temporary agency that worked under the direct supervision of the

Plaintiff. In fact, the employees of the temporary agency gave written praise to Barbara Israel, on

behalf of the Plaintiff, stating that she was one of the most professional, polite and organized Managers

they had ever worked with. It is more reasonable to believe that given the amount of reports given by the

Plaintiff, the Defendants will only make this argument in an effort to somehow gain the trust of the Court

as being in any small way caring towards or even feeling in any small way towards her.
40.
The Defendant, Mary Ewing submitted a report to the EEOC, in an effort to prove that she was

responsibly training Barbara Israel, yet the report was dated March 2015 and two months after Barbara

 Israel was hired and was being done by the Food and Beverage Director, instead of another staff member

who has more training and experience in the general management of a hotel. The report proves criminal

defamation of the Plaintiff by Mary Ewing, as it stated that the Bistro department, after she quit,

including the kitchen and walk-in cooler, was in subpar condition with spoiled and rotting food, etc. It is

more reasonable to think that given the amount of complaints submitted by the Plaintiff regarding

Bistro employees refusing to clean, refusing to properly fill out and complete logs and charts and

the fact that she was continuously forced to do their work, that the Plaintiff could not have suddenly

left the Bistro in any other condition that it was during the Q.A. report and as always, which was

exemplary. It is also more reasonable to think that given the amount of reports submitted by the

Plaintiff of Bistro employees improperly filling out forms and logs, signing off on logs and charts as

being completed, but in fact were not and the overall continuous breach of LBA Refreshing Business

rules, regulations and requirements, that the Plaintiff could in no way, suddenly began or allow the

logs and charts to be incomplete or not meet the requirements of the state. It is obvious that the report

given by Mary Ewing was an effort to build a defense against the Plaintiff's claim, otherwise

if the report was indeed factual, she would have submitted it prior to the forced quit, proving malice,

defamation, intent and the extent that the Defendant will go to protect themselves.

41. The HACCP Form A-1 is a legally required form and is regulated by FSIS, an agency of the United

States Agriculture Department. The Plaintiff made both verbal and in written documentation, over

ten (10) reports to Defendant, Mary Ewing, Food and Beverage Director and Philip Barrocas, Regional

Director of Openings, of Bistro associates failing to comply with FSIS rules and regulations and refusal

to comply with FSIS laws, verifying their knowledge of Federal and States laws being broken and

participation in the allowance of these broken laws.

42. The HACCP Form A3 was revised in May 2014, before the Plaintiff was hired as Bistro and

Catering Manager at The Courtyard by Shenandoah, Texas. The form is a legally required form and is

regulated by FSIS, an agency of the United States Agriculture Department. The Plaintiff made

both verbal and in written documentation, over ten (10) reports to the Defendant, Mary Ewing, Food and

Beverage Director and Philip Barrocas, Regional Director of Openings, of Bistro associates failing to

comply with FSIS rules and regulations and refusal to comply with FSIS laws, verifying their knowledge

of Federal and State laws being broken and participation in the allowance of these broken laws.

43. The Clean Water Act (CWA) is the primary Federal statute regulating The Daily Railroad

Cleaning Schedule.  The Plaintiff made both verbal and in written documentation, over ten (10)

reports to the Defendant, Mary Ewing, Food and Beverage Director and Philip Barrocas, Regional

Director of Openings, of Bistro associates failing to comply with Federal laws, verifying of the

knowledge of the laws being broken and the participation in the allowance of the broken laws.

44. The Daily Food Prep Chart is a legally required form that is regulated by, City, State and County under the laws of the FDA. The Plaintiff made both verbal and in written documentation, over ten (10) reports to the Defendant, Mary Ewing, Food and Beverage Director and Philip Barrocas, Regional Director of Openings, of Bistro associates failing to comply with FDA laws, verifying their knowledge Of the laws being broken and the participation in the allowance of the broken laws.

45. The Daily Waste Control Record is a legally required form that is regulated by the EPA under the Federal Government. The Plaintiff made both verbal and in written documentation, over ten (10) reports to the Defendant, Mary Ewing, Food and Beverage Director and Philip Barrocas, Regional Director of Openings, of Bistro associates failing to comply with Federal laws, verifying they're knowledge of the laws being broken and the participation in the allowance of the broken laws.

46. The Daily Freezer Pull List is a legally required form that is regulated by the HACCP under the FSIS, an agency of the United States Agriculture Department. The Plaintiff made both verbal and written documentation, over ten (10) reports to the Defendant, Mary Ewing, Food and Beverage Director and Philip Barrocas, Regional Director of Openings, of Bistro associates failing to comply with HACCP state and federal laws, verifying their knowledge of these broken laws and participation in the allowance of the broken laws. The Defendants failed the Plaintiff and also LBA, LBAM and Apple REIT.

## LEGAL ARGUMENT

The Plaintiff's conduct was protected by Rule 36 of the Federal

Rules of Civil Procedure Rule 26(b)(1)." Fed. R. Civ. P. 36(a)(1). Fed. R. Civ. P. 36(a)(1)(A–B) Fed. R. Civ. P. 36(a)rule 26, Fed. R. Cov. P. 35(a)(5),Fed. R. Civ. P. 36(a), Fed. R. Civ. P. 37(c)(2), Fed. R. Civ. P. 36(a)(3); Fed. R. Civ. P. 36(b), Fed. R. Civ. P. 36(a)(4), Fed. R. Civ. P. 36(a)(3), Fed. R. Civ. P 36(a) (6), Fed. R. Civ. P. 37(c)(2), Fed. R. Civ. P. 36(a)(4), Fed. R. Civ. P. 37(c)(2).

1. <u>The Americans With Disabilities Act, 2010 42 U.S.C. 12101</u> - The Americans with Disabilities Act of 1990 (ADA) prohibits discrimination and ensures equal opportunity for persons with disabilities in employment, State and local government services, public accommodations, commercial facilities, and transportation. It also mandates the establishment of TDD/telephone relay services. The ADA was revised by the ADA Amendments Act of 2008 (P.L. 110-325), which became effective on January 1, 2009. The ADA is codified at 42 U.S.C. 12101 et seq. On July 15, 2016, Attorney General Loretta Lynch signed a Final Rule revising the ADA title II and III regulations to implement the requirements of the ADA Amendments Act of 2008. The Final Rule was published in the Federal Register on August 11, 2016, and took effect 60 days after publication, on October 11, 2016.  Congress enacted the ADA Amendments Act to make a number of significant changes to the meaning and interpretation of the ADA definition of "disability" to ensure that the definition of disability would be broadly construed and applied without extensive analysis.

2. <u>Persons With Disabilities Civil Rights Act M.C.L.  37.1101 et seq.</u> ("PWDCRA") - AN ACT to define the civil rights of persons with disabilities; to prohibit discriminatory practices, policies, and customs in the exercise of those rights; to prescribe penalties and to provide remedies; and to provide for the promulgation of rules.

3. <u>Constructive Dismissal Section 95(1)(c) and section 136(1)(c)</u> of the Employment Rights Act 1996 states that where an employee terminates the contract with or without notice in circumstances that he or she is entitled to terminate it without notice by reason of the employer's conduct, there is a dismissal. In order to claim constructive dismissal, the employee must establish: That there was a fundamental breach of contract on the part of the employer. The employer's breach caused the employee to resign; and employee did not delay too long before resigning, thus affirming the contract and losing the right to claim constructive dismissal. Employees have the right not to be dismissed if they complain about or refuse to work in unsafe conditions (Sections 44 and 100 of the Employment Rights Act 1996). Where the employer fails to conduct a proper investigation into such allegations, harassment or bullying of an employee can lead to an 'unsafe condition' – entitling the employee to walk out until such time that the employer has remedied the situation. There's also the possibility of an employee walking out and not coming back, of course! The Employment Rights Act 1996 defines what is known as 'constructive dismissal' (ie an employee who resigns "in circumstances such that he or she is entitled to terminate their contract without notice by reason of the employer's conduct" is treated as having been dismissed). In such instances the dismissal will be treated as unfair.  An employee has the right not to be unfairly dismissed by their employer. If unjustified, even progressive disciplinary action can be viewed as constructive dismissal. Be assured that employment law places the onus squarely on employers to justify any actions taken.

32

4. <u>Prohibited Personnel Practices (5 USC § 2302(b)</u> Any employee who has authority to take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority. Solicit or consider any recommendation or statement, oral or written, with respect to any individual who requests or is under consideration for any personnel action unless such recommendation or statement is based on a. personal knowledge or records of the person furnishing it and consists of — an evaluation of the work performance, ability, aptitude, or general qualifications of such individual; or b. an evaluation of the character, loyalty, or suitability of such individual;

5. take or fail to take, or threaten to take or fail to take, a personnel action with respect to any employee or applicant for employment because of — any disclosure of information by an employee or applicant which the employee or applicant reasonably believes evidences — a violation of any law, rule, or regulation, or gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, if such disclosure is not specifically prohibited by law and if such information is not specifically required by Executive order to be kept secret in the interest of national defense or the conduct of foreign affairs; or

6. take or fail to take, or threaten to take or fail to take, any personnel action against any employee or applicant for employment because of —

7. exercise of any appeal, complaint, or grievance right granted by any law, rule, or regulation —
(i) with regard to remedying a violation of paragraph (8); or
(ii) other than with regard to remedying a violation of paragraph (8); testifying for or otherwise lawfully assisting any individual in the exercise of any right referred to in subparagraph (A);

8. take or fail to take, or threaten to take or fail to take, any personnel action against any employee or applicant for employment because of — the exercise of any appeal, complaint, or grievance right granted by any law, rule, or regulation —
(i) with regard to remedying a violation of paragraph (8); or
(ii) other than with regard to remedying a violation of paragraph (8); testifying for or otherwise lawfully assisting any individual in the exercise of any right referred to in subparagraph (A);

9. take or fail to take any other personnel action if the taking of or failure to take such action violates any law, rule, or regulation implementing, or directly concerning, the merit system principles contained in <u>section 2301</u> of this title; or

10. implement or enforce any nondisclosure policy, form, or agreement, if such policy, form, or agreement does not contain the following statement: "These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a

33

11. substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling."

12. <u>Tort of Negligence</u> - a Duty of Care – defined as the obligation to exercise a level of care towards an individual, as is reasonable in all the circumstances – to avoid injury (including psychiatric injury) to that individual. An employer would be in breach of this Duty of Care if it failed to do what it should reasonably be expected to do (or does what it should reasonably be expected not to do). An employer may be liable if they knew – or ought to have known – of any harassment, but failed to take reasonable steps to prevent it, with the result that an employee suffers ill-health.

13. <u>Workplace bullying</u> - Perhaps one of the most interesting developments in recent employment case law is resort to the Protection from Harassment Act 1997 in pursuing a settlement for claims in cases of workplace bullying.  Section 1 of the Act states: "A person must not pursue a course of conduct which amounts to harassment of another, and which he knows or ought to know amounts to harassment of another. The person whose course of conduct is in question ought to know that it amounts to harassment of another if a reasonable person in possession of the same,

14. information would think the course of conduct amounted to harassment of another". Section 8 adds: "Harassment of a person includes causing alarm or distress". A breach of the Act is a criminal offence, and can also lead to a claim for damages in the civil Courts.

15. <u>An employer may have a defense</u> under existing employment legislation if it can show that it took all reasonable steps to prevent harassment occurring, but not so when defending a claim for liability under the Protection from Harassment Act. In addition, when bringing a claim under the Act an employee doesn't have to show that he or she suffered a recognizable injury from the behavior (or that the injury was reasonably foreseeable). In fact, the Act specifically provides for a claim where the employee merely suffers 'anxiety'. It's likely to be much easier for an employee to bring a successful claim under the Act rather than a personal injury claim.

16. <u>Section 32 of the Crime and Disorder Act 1998</u> makes specific reference to racially-aggravated harassment. At this juncture, it's opportune to draw the definite distinction between 'harassment' and 'discrimination'. In England and Wales, Sections 28 to 32 of the Act create separate offences for crimes that were aggravated by the victim's race or religion or presumed race or religion. They did not originally apply to crimes that are aggravated by the offender's perception of the victim's membership of a religion but it was amended by <u>section 39</u> of the <u>Anti-terrorism, Crime and Security Act 2001</u> Racially or religiously aggravated harassment etc.

17. Putting a person in fear of violence - A person is guilty of an offence under section 32(1)(b) if he commits an offence under section 4 of the <u>Protection from Harassment Act 1997</u> which is racially or religiously aggravated within the meaning of section 28.

18. Racial Aggravated Harassment - A person is guilty of an offence under section 32(1)(a) if he commits an offence under section 2 of the <u>Protection from Harassment Act 1997</u> which is racially or religiously aggravated within the meaning of section 28.

34

19. ACAS – the Arbitration and Conciliation Service – defines bullying and harassment as being characterized by offensive, intimidating, malicious or insulting behavior. An abuse or misuse of power through means intended to undermine, humiliate, denigrate or injure the recipient. Such

20. behavior may be obvious or cleverly disguised and has to be viewed through the eyes of the recipient.

21. Health and Safety at Work Act 1974, employers have a statutory duty to ensure – so far as is reasonably practicable – the health, safety and welfare of employees while they're at work. Employees have the right not to be dismissed if they complain about or refuse to work in unsafe conditions (Sections 44 and 100 of the Employment Rights Act 1996). Where the employer fails to conduct a proper investigation into such allegations, harassment or bullying of an employee can lead to an 'unsafe condition' – entitling the employee to walk out until such time that the employer has remedied the situation. There's also the possibility of an employee walking out and not coming back, of course!

22. Stress related injuries - (1) All employers have a duty to take reasonable care for the safety of their employees to see that reasonable care is taken to provide them with a safe place of work, safe tools and equipment and a safe system of working.

23. Stress Related Mental/Psychological Injury - In deciding whether a risk is foreseeable or not, the following factors need to be taken into account: the nature and extent of the employee's work - is the workload greater than that normally expected for this type of job? signs from the employee themselves of impending harm to their health from work-related stress - has the employee previously suffered any stress-related harm.  The CA set out factors - the key ones are listed below - that must be taken into account by the courts once it has been established, on the balance of probabilities, that it was reasonably foreseeable that an employee would suffer harm as a result of work-related stress. Employers are only in breach of their duty of care if they fail to take reasonable steps to prevent employees suffering as a result of work-related stress (that is, fail to follow the stress management standards). It's not enough for the claimant (injured person) to show that they are suffering harm as a result of work-related stress; they must be able to demonstrate that their injury/illness was caused by the employer's breach of their duty of care by failing to take reasonable steps to protect the employee. No type of work may be seen as intrinsically dangerous to mental health.  All this means that, in practice, an employee is unlikely to have a valid claim unless they can demonstrate that they have told their employer that they are suffering, or suspect they are suffering, from work-related stress. But this proviso doesn't take away the employer's legal duty to take proactive measures, such as stress risk assessments, to identify stress risk factors in the workplace, and to implement control measures to minimize such risks by adopting the stress management standards

24. The Crime and Disorder Act 1998 (c.37) is an Act of the Parliament of the United Kingdom. The Act was published on 2 December 1997 and received Royal Assent in July 1998. Its key areas were the introduction of Anti-Social Behaviour Orders, Sex Offender Orders, Parenting Orders, granting local authorities more responsibilities with regards to strategies for reducing crime and disorder, and the introduction of law specific to 'racially aggravated' offences.

<u>Amended Claim</u>

- <u>Pernicious Abuse</u> No evidence of it is left behind and no-one has ever been convicted of it, yet in reality, what is termed, pernicious abuse is something which can and did have a devastating effect, not just on the Plaintiff, but also within her family. Pernicious abuse led the Defendants, Philip Barrocas, Mary Ewing, Marsha Cannon, Farrah Adams and Barbara Israel into carrying out acts such as covert psychological murder, or perhaps even covert psychological manslaughter - something which is very real, insidious in nature but unfortunately unrecognized and virtually unquestioned, as in the case of the Plaintiff.
- <u>Psychological murder</u> can take many forms but the type the Plaintiff suffered is of a covertly narcissistic and/or sociopathic nature. It may be too difficult for some people to be able to comprehend but it does happen and in fact, happened to the Plaintiff over a period of approximately 5 months and continues to date.
- <u>Narcissistic/Sociopathic (narcopathic) abuse</u> took place when Defendants, Philip Barrocas and Barbara Israel, narcissists or sociopaths (or narcopaths) attempted to convince the Plaintiff, who had discovered their unbelievably shallow secrets, gradually over time, that she was inferior and proceeded to manipulate her into keeping quiet or to ultimately face their wrath. They used techniques such as inferior-making, character assassination and gaslighting in order to get the Plaintiff to question her own sanity. They generally did so by ostracizing the Plaintiff from the other hotel managers, while continuing to act out their part, expertly hiding their truly outrageous behavior, whilst successfully having everyone around them fooled - everything was done to appease those in control of them, in this case, Farrah Adams and Larry Blumberg, while their manipulative and controlling tactics took place behind the scenes, being orchestrated and directed by Marsha Cannon, outside of people's awareness. The Plaintiff was forced to question her own sanity because she could not understand or find valid reason as to why she was being targeted. The Plaintiff was the victim because everything done to manipulate her was done outside of her conscious awareness.
- <u>Anti-social values:</u> This is also known as criminal thinking. The Defendants included criminal rationalization or the belief that their criminal behavior was justified and would never be discovered. In possessing this trait, the Defendants placed blame for their negative behavior on the Plaintiff, and showed a lack of remorse.

- <u>Criminal Peers:</u> Individuals with this trait often have peers that are associated with criminal activities. The Plaintiff witnessed the Defendants Philip Barrocas and Mary Ewing, involved with substance abuse of alcohol on three different occasions in a five-month period of time. Their peer influence also persuaded other hotel employees to engage in this behavior. During the hotel's opening party, Mary Ewing became intoxicated, stumbled, used slurred speech and seemed incapable of controlling her thoughts. This drinking and partying continued upon the return to the hotel, where all executive level employees were openly intoxicated, including Acting General Manger, Keith McCabe, General Manager, Linda DeWalt and Regional Director of Openings, Philip Barrocas.

36

- <u>Low self-control:</u> This involves one's ability to control temperament and impulsivity. The Defendants, Philip Barrocas and Barbara Israel, who seem to carry this trait often did things, coerced things, approved things and ignored things that they didn't plan out very well, and failed to think before acting. The mindset, in the case of the Plaintiff was of the here and now, and not on the consequences of their behavior, mostly because they believed that all evidence of the actions of discrimination had been done away with, giving them a false sense of security in continuing to constructively discharge the Plaintiff.

Court Cases

1. <u>In the case of Teasdale versus John Walker (t/a Blaydon Packaging), a Tribunal decided that a breach of the duty to take reasonable care of an employee's Health and Safety</u> was a fundamental breach of contract which entitled the employee to claim he had been constructively dismissed. As the 'dismissal' fell within Sections 44 and 100 of the Employment Rights Act, it was deemed automatically unfair

2. <u>In the case of Harvest Press versus McCaffrey (1999), McCaffrey – a victim of workplace bullying</u> – complained that he'd been constructively dismissed in circumstances covered by Section 100 of the Employment Rights Act. His employers countered that the term 'danger' only applied to dangers arising out of the workplace itself, and not circumstances of danger caused by the behavior of other workers.

3. There have been two notable cases of this legislation being used at Employment Tribunals. The landmark judgement in the case of <u>William Majrowski versus Guy's St Thomas</u> NHS Trust (1995) set the precedent that <u>employers can now be held vicariously responsible for bullying of their staff by members of their staff.</u>

4. In the case of <u>Helen Green versus Deutsche Bank Group Services</u> (UK) Ltd (2006), the High Court upheld a claim for <u>personal injury against the employer due to psychiatric illness caused by bullying and harassment.</u>

5. Similarly, in <u>Green versus DB Group Services</u> (UK) Ltd the High Court found that the claimant's managers knew – or ought to have known – that she was being harassed by fellow workers, and that a responsible employer would have intervened as soon as it became aware of the problem. The culprits should have been warned about their behavior and informed that disciplinary action could be taken against them if they persisted. <u>The behavior of the perpetrators amounted to harassment under the Protection from Harassment Act because it was targeted at the individual, occurred with great frequency</u> and was calculated to distress. <u>The Court upheld Green's claim and duly awarded damages of GB pound 828,000 plus legal costs.</u>

6. In <u>Dunnachie versus Kingston-Upon-Hull City Council</u> (2004), the Law Lords decreed that they saw: "...no reason why, in an appropriate case, the amount of compensation should not include compensation for distress, humiliation, damage to a person's reputation in the community or to their family life". <u>This is the first time a Court has indicated that claimants in unfair dismissal cases can be compensated for any kind of loss (including psychiatric injury).</u>

37

7. _Swansea University Pension & Assurance Scheme v Williams_ (EAT) This was one of the first appeal decisions on what is now a common disability discrimination claim: discrimination arising from disability under section 15 of the Equality Act 2010.This section makes it unlawful for an employer to treat an employee unfavorably because of something "arising in consequence of" disability.

8. _Ramphal v Department for Transport_ (EAT) This was perhaps the 2015 case that caused the biggest stir among HR professionals. In this case, the EAT explained in detail the role of HR in disciplinary proceedings. It held that a dismissal will be unfair if the decision to dismiss an employee is improperly influenced by the HR department. The case shows that HR should limit advice to managers conducting investigations and disciplinary procedures to law and procedure and the level of appropriate sanctions with a view to achieving consistency.

9. Matheson Trucking and Matheson Flight Extenders Inc. included $14 million in punitive damages, said attorney Lynn Feiger, "Ms. Capra became more openly hostile towards black employees, encouraging the supervisors and leads under her management to do likewise," the lawsuit says. "Under Ms. Capra's management, black employees were discriminated against with respect to almost every aspect of their employment."

10. Austin Foam Plastics Pays $600,000 To Settle EEOC Harassment Suit

Source: EEOC, EEOC Date: October 20, 2010Austin Foam Plastics, Inc., a producer and distributor of corrugated box and cushion packaging, will pay $600,000 to settle a racial harassment, sexual harassment and retaliation lawsuit filed by the U.S. Equal Employment Opportunity Commission (EEOC), the agency announced today.

11. HOUSTON – A Houston-area construction company will pay $122,500 and provide additional remedial relief to resolve a discrimination lawsuit filed by the U.S. Equal Employment Opportunity Commission (EEOC), the agency announced today. The EEOC had charged that Pace Services, L.P. discriminated against Mohammad Kaleemuddin because he is of the Islamic faith and of East Indian descent, and against 13 other employees because they are black or Hispanic.

12. EEOC Obtains $122,500 from Houston Construction Company for Religious, Race and National Origin Discrimination The EEOC's lawsuit (Civil Action No. 4:08cv2886, in U.S. District Court for the Southern District of Texas, Houston Division) asserted that a Pace supervisor referred to Kaleemuddin as "terrorist," "Taliban," "Osama" and "Al-Qaeda." According to the EEOC, despite Kaleemuddin's complaints, Pace never took action to stop the harassment, which continued up to the day when the supervisor fired him. The EEOC further claimed that the same supervisor, as well as others in Pace management, regularly referred to African Americans as "n-----s" and to Hispanics as "f-----g Mexicans." Under the terms of the consent decree settling the suit, signed by U.S. Magistrate Judge Stephen William Smith, Pace Services will pay $61,250 in relief to compensate Kaleemuddin. An additional $61,250 will be distributed among the other non-Anglo employees who were also harassed. In addition to the monetary payments, the decree

38

directs that Pace's owner shall provide a signed letter of apology to Kaleemuddin, that the manager alleged to have made many of the racist remarks be prohibited from ever working again for Pace, and that Pace provide employee training designed to prevent future discrimination and harassment on the job.

13. U.S. / Titan Concrete to Pay $135,000 to Settle EEOC National Origin, Age and Retaliation Lawsuit Against Subsidiary, Titan Concrete Industries MEMPHIS – Houston-based U.S. Concrete will pay $135,000 to settle a national origin, age and retaliation lawsuit filed by the U.S. Equal Employment Opportunity Commission (EEOC) against its Memphis subsidiary, Titan Concrete, according to an agency announcement released today. The EEOC charged in its

suit against Titan Concrete (Civil Action No. 2:09-cv-02208-JPM-cgc, filed in U.S. District Court for the Western District of Tennessee) that company officials harassed and discriminated against a Thai-American employee because of his East Asian national origin and age. David Piyavunno, a sales technician, was called "J-p" (although he is of Thai ancestry, not Japanese) subjected to insensitive ageist comments, and then removed from the sales department and demoted to a driver job because of his age and national origin. After Piyavunno complained about the discrimination, he was further harassed, including being assigned to defective trucks, and repeatedly threatened with firing. Further, after Titan moved Piyavunno out of sales, it hired two unqualified white men into that department, without an application process that would have given Piyavunno the chance to apply for the positions. Ultimately Piyavunno resigned after the work environment at Titan became too hostile to endure.

14. *O'Bannon. v. Friedman's* is a class action race discrimination case filed in 2003 against a national jewelry store chain in the federal district court in Maryland. Three African American plaintiffs and one white plaintiff alleged that Friedman's discriminatorily denied hiring to African Americans for store associate and store manager jobs, denied promotions to African Americans for higher level management jobs, and paid African American employees less than similarly qualified white employees in the same job.

15. *McClain v. Lufkin Industries, Inc.,* is the oldest case on Goldstein Demchak's docket but is still being actively litigated. The case is a race discrimination class action brought by African American hourly and salaried employees of Lufkin Industries, Inc., an East Texas oilfield equipment manufacturing company. Plaintiffs alleged that Lufkin's subjective employment practices had an unlawful disparate impact on African Americans in initial job assignments and promotions. The district court certified the class in 1999. *McClain v. Lufkin Industries, Inc.*, 187 F.R.D. 267 (E.D. Tex., 1999).

16. *Rice v. Southern California Edison Co.,* Case No. 94-6353 (JMI) was a class action lawsuit brought by African American employees of Southern California Edison, one of the largest electric utility companies. Plaintiffs alleged that the company maintained a "glass ceiling" that limited

39

17. promotional opportunities for African Americans and also that African Americans were <u>paid less than similarly situated white employees.</u> The case was settled in 1996 for $18.2 million and extensive injunctive relief over a seven year period.

18. House of Lords in <u>Johnson v Unisys Ltd</u> held that where the unfairness occurred in the manner of a dismissal the only available remedy is a tribunal <u>claim for unfair dismissal</u>, and not a claim for psychiatric harm resulting from breach of the employment contract or for negligence. The issue at what point the pre-termination breach of trust and confidence becomes part of a dismissal so as to prevent a claim in the courts has arisen in cases where employees have suffered psychiatric injury as a result of unfair disciplinary procedures and suspensions, but the law in this area is in a considerable state of flux. There is uncertainty, for example, as to the employer's additional liability for psychiatric injury (additional, that is, to the liability for unfair dismissal) where an employee is unfairly constructively dismissed by reason of oppressive treatment.

19. The case of <u>Walker v. Northumberland</u> C.C. [26] established that the duty of care owed by employers to employees also extends to <u>psychiatric injury and that work-related stress</u> can result from either the character of the work carried out or the volume of work. Mr Walker was employed as a manager for social services department at NCC. He suffered two nervous breakdowns due to overwork and stress. After his first breakdown he told his employer that he was suffering from stress. NCC said it would provide help and reduce his workload. When he returned to work, nothing was done to alleviate his stress. He had another nervous breakdown and sued NCC for breach of its duty to take care of his safety. Colman, J held that the first breakdown was not foreseeable, but the second was entirely likely unless the employer took steps to change the situation. As it had not, NCC was held to be in breach of its duty to provide a safe system of work. Walker's case was a landmark in that it was the first reported case of an employer being held liable for stress at work. However, the emphasis on foreseeability suggested that it might not open up the floodgates to stress claims, bearing in mind that the claimant failed to persuade the court that his original breakdown was reasonably foreseeable by his employer.

The Defendant will argue the following:


<u>On behalf of Sr. Vice President of Hospitality, Farrah Adams.</u> That she quickly responded when I contacted her and reported what was going on at the hotel.

- Stated that someone, not herself, would be getting back to me.
- Never picked up the phone and spoke directly with me.

- Never contacted me via email in response to my reports of discrimination.
- I never heard back from her again, or ever was told of an investigation to my report to her or the outcome of any investigation of my report.
- Looked the other way and decided that what I was going through did not personally affect her.
- Works directly with Larry Blumberg, who is CEO and Owner of LBAM.

On behalf of Regional Director of Openings, Philip Barrocas. That he was not aware of the problems or issues regarding discrimination reports and complaints from the Plaintiff. That he hired the Plaintiff, therefore, could not be charged with race discrimination or classism. That the Plaintiff was given a PIP in an effort to help her.

- From the very beginning of the Plaintiff's tenure at The Courtyard by Marriott, Shenandoah, Texas, October, 2014, Philip Barrocas was made aware of acts of bullying and unprofessional behavior.
- Philip Barrocas did not want to hire the Plaintiff and only did so at the urging of then hotel General Manager, Amy Lusk. Philip Barrocas was very rude during the telephone interview and made the statement, "Some people say I'm a hard-ass, but if you do your work and try hard, you'll be okay".
- During the telephone interview with Philip Barrocas, the Plaintiff requested that she be paid more given the job description and expected duties. Philip Barrocas refused and stated that the pay would be 30,000 per year as a salaried employee. The Plaintiff asked for time to consider the position and was later contacted by then hotel General Manager, Amy Lusk and told that she (Amy) had fought for me and that Philip had agreed to raise the pay to 33,000 per year, which was still below the pay rate of every other Manager at the hotel.
- Philip Barrocas directed then Acting General Manager, Keith McCabe to give the Plaintiff a PIP as an act of retaliation. He was angry that the Plaintiff had stood up for herself by citing LBA rules and regulations and state and federal laws, when being discriminated against. He knew that the Plaintiff never showed any acts of aggression, unprofessionalism or insubordination, which caused him to lose control of the situation. Anecdotal evidence, given by The University of Akron, suggests that interactions with arrogant individuals can be uncomfortable and that this effect is amplified when the arrogant individuals occupy positions of authority in organizations. Many jobs require continuous interaction between employees and their supervisors, effectively limiting the ability to avoid abuse by an arrogant boss. Managers typically have power over work assignments, promotion opportunities, and performance reviews. This can place subordinates of arrogant managers between a proverbial rock and hard place. The employee who says nothing is subjected to criticism and unrealistic demands, but the employee who does speak up is likely to experience backlash (and the manager's behavior still may not change or perhaps will worsen).

41

<u>On behalf of Food and Beverage Director, Mary Ewing.</u> That although she was aware of on-going issues at The Courtyard by Marriott, Shenandoah, Texas, the fault did not lie with her or her failure properly train the Plaintiff. That she in no way coerced or suggested the Plaintiff to change the logs and/or charts in the Manager's Food and Beverage binder. The Plaintiff had taken the binder home with her, without her (Mary) knowledge. That the Plaintiff left the Bistro in substandard condition.

- During the Plaintiff's tenure at the hotel, she (Gwen) and Mary Ewing mostly trained by phone during Mary's travel. During those conversations with the Plaintiff, Mary Ewing complained continuously of how overworked she was, how stressed she was and how she knew what was going on at the hotel was wrong. She felt comfortable in doing so, because the Plaintiff continuously reported the discrimination that she (Gwen) was suffering during these conversations.
- Mary Ewing was to supervise, train and manage over fifty (50) hotels and their Food and Beverage Managers. Mary complained that she was not given the budget to fly, but had to drive and that it was taking a toll on her. That she was not only expected to supervise, train and manage all of the Food and Beverage Managers, but at many times, such as with The Courtyard by Shenandoah, she was forced to perform the duties of General Manager, training Housekeeping and Front Desk Managers.
- Mary Ewing was willing to do whatever it took to keep her job and repeatedly suggested to the Plaintiff that she stay with the company because if she (Gwen) quit, the burden of finding a replacement and training that replacement would be on her (Mary). She stated several times to the Plaintiff, "You haven't done anything wrong, the problem is, you've done everything right", when asked why it was that Philip Barrocas was treating her (Gwen) in such an egregious manner.
- Every hotel Manager was told from the beginning of their hire that the Manager's binders were they're "Bibles" and were labeled as such. All Managers were told to keep their bibles with them at all times, and directed to take them home, if need be, to work on them in an effort to keep them up to standard in expectation of an unannounced Q.A. visit.
- The night that the Plaintiff finally left the hotel, the condition of the Bistro was immaculate, as always. There has never been one complaint, before the Plaintiff's claim from anyone, including the Defendant. As a matter of fact, the Defendant often bragged on the upkeep, cleanliness and overall look of the Bistro kitchen. The Defendant's Q.A. report verifies this and Mary Ewing, in an attempt to pass the blame for her failed leadership, wrote the report and falsified statements, defaming the Plaintiff.
- Barbara Israel, General Manager at the hotel, began work in January 2015, yet the report from Mary Ewing, dated March 2015, verifies that she (Mary) Food and Beverage Director, was just training Barbara on her job duties.

The Plaintiff will use the Defendant's own words against them in stating that no matter what, the overall failure of leadership was caused by themselves and therefore the failure of the Plaintiff and every other employee at The Courtyard by Marriott is their responsibility. Reminding them that this is exactly what was given as sworn testimony by the Defendant.

On behalf of Marsha Cannon, Human Resources Director. Remembers speaking with the Plaintiff, but could not remember the details of the conversations. Took the Plaintiff's reports of discrimination seriously and agreed to, "help her". Although she was aware of the ongoing problems and issues of discrimination, she took the appropriate steps to protect her (Gwen).

- Marsha Cannon spoke with the Plaintiff on five occasions, two of them being from home and one of them lasting over an hour. During these conversations, Marsha would tell the Plaintiff to slow down, breathe, stop crying because she couldn't understand her (Gwen) and that she was so sorry about what she was suffering.
- The Defendant, as Human Resources Director, is trained on all policies and procedures. She (Marsha) has the knowledge and the responsibility to investigate, report and stop any/all forms of discrimination on behalf of the company. She breached the Plaintiff's contract by quoting false company policy to the Plaintiff, "It is LBA policy, not to share the outcome or details of any investigation to employees". The Plaintiff requested these reports and investigation several times and each time, Marsha Cannon, stated the same falsified policies.
- Marsha Cannon was very careful not to put anything in writing that would incriminate herself in any way. Each time she (Marsha) spoke in detail of the Plaintiff's discrimination, it was done by telephone. She also had knowledge of and directed the other Defendants, in how to go about doing the same thing. Marsha Cannon never reported the discrimination against the Plaintiff by Philip Barrocas, Farrah Adams, Mary Ewing, or Barbara Israel, which she had the duty and responsibility to do. She had information and authority to contact Larry Blumberg himself and report what was going on but intentionally chose not to do so.

On behalf of Barbara Israel, General Manager. The Defendant will not testify on her behalf. Barbara Israel was used as the person who would finally force the Plaintiff to quit. She, as well as Keith McCabe and Amy Lusk, if summoned, will be used as hostile witnesses.

- All three were witnesses to the discrimination of the Plaintiff and were fired.
- All three can testify to the egregious workplace environment and the many incidents that the Plaintiff suffered and reported at the hands of Philip Barrocas, Mary Ewing and Barbara Israel.
- Barbara Israel has given sworn written testimony on behalf of the Plaintiff, proving that she, (Barbara), as well as Philip Barrocas, Mary Ewing and Marsha Cannon, all gave false testimony in previous statements to the EEOC.
- All three will testify that each of them were coerced into discrimination against the Plaintiff, with possible loss of employment, by Philip Barrocas.

43

On behalf of Larry Blumberg, CEO and Owner of LBAM, Apple Hospitality REIT and all other subsidiaries of LBA Hospitality. The executive branch of the Defendant was unaware of the ongoing reports of discrimination made by the Plaintiff. That they in no way should be held liable in the lawsuit. That they in no way took part in any of the actions against the Plaintiff, therefore should not be penalized for the actions of their employees, Philip Barrocas, Mary Ewing, Marsha Cannon and Barbara Israel.

The Plaintiff will bring out evidence of the Defendant's knowledge of discrimination in an email from Human Resources Director, Marsha Cannon to Regional Sales Director, Rob Dietrich and Elizabeth B. Glasgow, attorney for the Defendant during the Plaintiff's Unemployment hearing.

- After the Plaintiff suffered much discrimination and was not helped, she (Gwen) contacted Sr. Vice President of Hospitality, Farrah Adams, who works directly with and under the supervision of CEO and Owner of LBAM, Larry Blumberg. Farrah Adams had every opportunity to demand that the Plaintiff be protected under the law and follow the laws of LBA by demanding that an investigation be done and the outcome be presented to both she (Farrah) and the Plaintiff, showing proper steps had been taken to stop the discrimination, but she intentionally failed to do so.
- It is the duty and responsibility for the executive branch of the company to know and understand the laws of its organization and to take proper steps, such as those which come with their authority to do so, to protect its employees, no matter which level of position, including firing the person (s), in this case, Philip Barrocas, Farrah Adams, Marsha Cannon, Mary Ewing and Barbara Israel, due to the amount of evidence proving liability in this claim. The direct line to the executive branch in this claim is both Philip Barrocas and Farrah Adams.
- Regional Director of Sales, Chris Landry, works with Farrah Adams and was sent to investigate the ongoing problems at the hotel. He also admitted that what was going on at the hotel was both egregious and unlawful. At that time, he shared that he knew of Philip Barrocas' discrimination practices and that they (Chris and Philip) did not get along. He also shared that Philip Barrocas was his direct Supervisor and that if he (Chris) reported the incident in too much detail, Philip would definitely fire him. Chris Landry would be summoned as a hostile witness by the Plaintiff.
- Each named party in the lawsuit are subsidiaries of LBAM and therefore should be held liable for the actions of their leadership and employees.
- The Plaintiff will use these emails to prove that in spite of everything that she has proven to have suffered, she (Gwen) was still willing and trying to remain positive, professional and fulfil her job duties.
- Plaintiff's emails will disprove the Defendant's claim that she failed as a leader in training her staff and in fact, performed above all other hotel Managers in spite of the abuse she was enduring.

44

- Plaintiff will bring out evidence of Philip Barrocas and Keith McCabe both giving false statements about company policies and further proving the Plaintiff's claim that this was a practice done under the direction of Human Resources Director, Marsha Cannon.
- The Defendant will try and use the Plaintiff's hand-written documentation as, "hearsay", in an effort to get this evidence thrown out. The Plaintiff will bring out the evidence that she (Gwen) was denied access to her work area and company computers, forcing her to resort to handwritten documentation.
- The Defendant will try to prove that the Plaintiff did suffer painful Sickle Cell crisis during her tenure at the hotel, but that it was in no way due to stress or exertion. The Plaintiff will bring out evidence and state the overwhelming number of times that she reported discrimination to Philip Barrocas, Farrah Adams, Mary Ewing, Marsha Cannon about her peers, subordinates and supervisors, Barbara Israel and Keith McCabe. Keith McCabe will be summoned as a hostile witness by the Plaintiff.
- The Defendant will try to prove that the Plaintiff was not overworked. The Plaintiff will bring as evidence her (Gwen) request for discovery in the form of records of her Micros Key card, including record of the Bistro staff's, Euradice, Annebell, Rauel as proof of the amount of times each clocked in and out, providing dates and times.
- The Defendant will try to disprove intent. The Plaintiff will use as evidence the amount of times she reported discrimination and the fact that as leadership, the Defendants, Farrah Adams, Philip Barrocas, Mary Ewing, Marsha Cannon and Barbara Israel all had the training and duty to report discrimination and follow the state and federal laws of employment. The Plaintiff at this time, will bring out evidence submitted by Barbara Israel, proving conspiracy to constructively fire her.

### Research

Lessin and Jensen 1974 (pp. 529-532) present the history of research on sickle cell.
Manley 1984 (pp. 67-71) review the federal and state sickle cell legislation that was passed in the 1970s.

### Experts on the Effects of Stress in Sickle Cell Sufferers

George Buchanan, M.D.
Professor of Pediatrics and Director
Division of Hematology-Oncology
Department of Pediatrics
University of Texas Southwestern Medical Center at Dallas

Barbara Yawn, M.D., M.S.P.H.
Director of Research
Olmsted Medical Center
Adjunct Professor, Family and Community Health
University of Minnesota

Araba Afenyi-Annan, M.D., M.P.H.
Assistant Professor
University of North Carolina at Chapel Hill

Samir Ballas, M.D.
Professor, Department of Medicine
Thomas Jefferson University

Kathryn Hassell, M.D.
Professor of Medicine, Division of Hematology
Director, Colorado Sickle Cell Treatment and Research Center
University of Colorado Denver

Andra James, M.D., M.P.H.
Director, Women's Hemostasis and Thrombosis Clinic
Associate Professor of Obstetrics & Gynecology
Associate Professor of Medicine
Duke University Medical Center

Lanetta Jordan, M.D., M.P.H., M.S.P.H.
Director of Sickle Cell Services
Memorial Healthcare System
South Broward Hospital District

Sophie Lanzkron, M.D.
Director, Sickle Cell Center for Adults at Johns Hopkins

Richard Lottenberg, M.D.
Division of Hematology/Oncology
Professor of Medicine
University of Florida

William Savage, MD
Divisions of Transfusion Medicine and Pediatric Hematology
School of Medicine
Johns Hopkins University

Paula Tanabe, Ph.D., R.N., M.S.N., M.P.H.
Associate Professor
Duke University, Schools of Nursing and Medicine

46

Russell E. Ware, M.D., Ph.D.
Professor of Pediatrics and Vice-Chairman of Global Health
Director, Texas Children's Center for Global Health
Director, Baylor International Hematology Center of Excellence
Baylor College of Medicine and Texas Children's Hospital

Dr. Alecia C. Nero, M.D.
Assistant Professor Internal Medicine and Pediatrics
UT Southwestern Medical Center
Clinical and Translational Science Award
Department of Clinical Sciences
5303 Harry Hines Blvd,
Dallas, TX
Zip - 753907208

## PLEA TO THE COURT

Based on the evidence submitted to the Court, Plaintiff, Gwendolyn P. Wright was forced to resign due to Disability and Civil Rights Discrimination, suffered both physical and mental injury, loss of employment, loss of ability to care for herself and her family, defamation, loss of business and contemplated suicide and is entitled to all Compensatory Damages and Punitive Damages and Injunctive Relief and Affirmative Relief and Gifts and any other Considerations of the Court.

The Plaintiff humbly request that the Court seeks justice on her behalf. I beseech you to demand the Defendants, LBA Hospitality, LBAM Investment Group, Apple Hospitality REIT, Philip Barrocas, Farrah Adams, Mary Ewing, Marsha Cannon, Barbara Israel, subsidiaries and/or employees of Marriott International, to honor the Plaintiff's demands without alleviation of any or failure to comply fully to any, or attempt to reject or hinder any or attempt to prolong relief of suffering of any requests and/or demands by Plaintiff in her submitted complaint Index No. 4:17-cv-01838 to the Court, in hope and expectation to erode the continuity and viability of the of the claims over time.

47

## Final Statement to The Court

Sickle Cell Anemia is a serious, life threatening disability, which is exacerbated by overwhelming stress, extreme exertion, improper diet and other complications. The Plaintiff in no way could have simulated an episode of painful Sickle Cell Crisis suitable to be hospitalized as stated by the Defendant, neither did the Plaintiff have the capability or reason to falsify legal medical documents, as the Defendant has sought to prove.

## Stigmatization and Sickle Cell Disease

Stigmatization is the process of identifying an attribute of a person or group and associating the attribute with a stereotype that negatively labels or brands another in a way that is perceived as disgraceful by society. More specifically, health-related stigma refers to a form of devaluation, judgment, or social disqualification of individuals based on a health-related condition. Work-related stigma is increasingly becoming a major public health issue that is receiving more attention as stigmatization adds to the burden of individuals and families affected by sickle cell disease (SCD). Despite this, there is minimal information in the literature about SCD and health-related stigma. SCD refers to a family of inherited autosomal recessive genetic disorders that affects about 1 in 365 African Americans, with approximately 89 in 1079 having the disease in the United States. Individuals who have sickle cell disease produce abnormal hemoglobin S molecules.

Many of the clinical manifestations of SCD are due to deoxygentation, vaso-occlusion, and tissue necrosis. Upon deoxygenation or extremes in temperature, the hemoglobin S molecules cause the red blood cells to assume a sickled shape and adhere to the vascular walls as a result of polymerization. Consequently, the sickled cells can lead to occlusion within the capillaries and small vessels, causing pain, tissue necrosis, and eventually anemia and ischemic organ conditions. The clinical manifestations of SCD often lead to unpredictable episodes of pain and feelings of inadequacy regarding the mistreatment and discrimination in the workplace, which is due to health-related stigmatization.

Much of the literature on health-related stigma originated from infectious diseases such as human immunodeficiency virus (HIV)/AIDS, tuberculosis, and leprosy as well as from mental health conditions such as schizophrenia. HIV/AIDS-related stigma has had a significant impact on the health and well-being of individuals around the world for 2 decades, although in the case of Sickle Cell Anemia, the disease is often the cause of "racial discrimination" According to Sartorius, "stigma evokes negative attitudes and feelings and usually results in discrimination of the person or institution in various walks of life." This level of stigma can lead to unjust disadvantages for the stigmatized, including direct discrimination on the job, in schools, and within families, and may impact the receipt of timely and

48

quality health care. Health-related stigma can have a deleterious affect across the lifespan on individuals being stigmatized.

Individuals with chronic diseases such as chronic obstructive pulmonary disease and chronic pain also face health-related stigmatization on the job. They may feel exiled from the healthier world and feel disgraced due to health encounters and lack of support by providers, friends, family, the community, and the workplace.

The purpose of this paper was to support the need to develop patient-oriented interventions to prevent and treat health-related stigma in young adults with SCD, as these individuals may face health-related stigma throughout their lives as they live with a chronic illness, but especially as they transition from pediatric to adult care. Additionally, a theory is offered from which interventions can be derived.

Disabilities Civil Rights Act, The Employment Rights Act of 1996 section 95 (1)c,, The

Employment Rights Act of 1996 section 95 (1), The Health and Safety at Work Act 1974 Sections

44 and 100, the Employment Rights Act 1996, Section 32, c.37, Section 28, of the Crime and Disorder

Act 1998. Due to intentional interference, negligence, proximate, joint tortfeasors, imputed negligence,

limited duty, absolute nuisances, misrepresentation and non-disclosure, defamation, misuse of legal

procedure, domestic and economic relations, and thoughts of suicide, Plaintiff has sustained injuries and

damages. Plaintiff brings this action to recover the losses suffered by Gwendolyn P. Wright at the

hands of The LBA Hospitality, LBAM Investor Group, LLC, Apple Hospitality REIT, Inc., Philip

Barrocas, Mary Ewing, Farrah Adams, Barbara Israel and Marsha Cannon in Monetary Relief, to include,

Wage and Salary loss, Fringe Benefits and Compensatory Loss in the amount of no less than that

demanded in this claim, plus punitive damages, plus injunctive relief, plus affirmative relief and gifts for

emotional and psychological injury and loss of her business as follows:

49

**Monetary Relief**

Back pay – <u>Wages and Salary</u>

The Plaintiff suffered loss of salary for three years, (33,000 per year), catering

commission, (500.00 per month), tips (100 per week), cost of living increase and

promotions that she would have earned absent discrimination in the amount of at least

99,000 + 18,000 + 14,400. (Total – 131,400.00) One Hundred-Thirty-One Thousand

Four Hundred Dollars.

<u>Fringe Benefits</u>

The Plaintiff suffered loss of vacation pay, retirement benefits, bonuses and medical

and life insurance in the amount of at least 10,000 per year for three years. (Total

30,000.00) Thirty Thousand dollars.

<u>Compensatory Damages</u>

In the amount of at least, $300,000 per year for employers with 501 or more

employees for three years, 42 U.S.C. § 1981a(b)(3) 300,000 x 3 yrs. (Total 900,000.00)

Nine Hundred Thousand Dollars.

<u>Punitive Damages</u>

Emotional distress, malice, negligence, reckless indifference, constructive discharge,

defamation, classism and terrorism in the amount of at least three year's salary, at 33,000

per year from the date of the onset of constructive/forced quit/resignation to the present.

33,000 x 3 years, the Courtyard by Marriott Hotel, Shenandoah, Texas, (Total 99,000.00)

Ninety-Nine Thousand Dollars.

Emotional distress, malice, terrorism, reckless indifference, constructive discharge in

the amount 1,000,000 (one million dollars) per company, LBA Hospitality, LBA

Investment Group, LLC, Apple Hospitality REIT, Inc., total 3,000,000 (Total 3,000,000.00) Three Million Dollars.

Emotional distress, malice, terrorism, reckless indifference, constructive discharge in the amount of 350,000.00 (three hundred, fifty-thousand dollars) per Regional Director, Philip Barrocas, per Sr. Vice President of Hospitality, Farrah Adams, per Human Resources Director, Marsha Cannon, per Food and Beverage Director, Mary Ewing, total 1,400,000.00 (One million four hundred thousand dollars)

Emotional distress, malice, terrorism, reckless indifference, constructive discharge in the amount of 150,000 (one hundred fifty-thousand dollars) per General Manager, Keith McCabe, Barbara Israel, Linda DeWalt, total 450,000 (Four hundred fifty thousand dollars).

Pet-Tacular Events, Plaintiff's new business, was prevented from acquiring operations of an existing business, due to loss of income that would have secured legal fees and requirements, state and federal tax requirements, loss of family income and yearly cost of living increases, including loss of opportunity to own her own business as planned in the amount of 10% of 50,000,000 (Total Five Million) Five Million Dollars for start-up capital, for business and investment purposes, as stated in the Plaintiff's Business for Pet-Tacular Events.

Gift for contemplation of death by suicide, emotional distress, ongoing mental injury and thoughts of fear of loss of life in the amount of 7,000,000.00 for three years.

Total 21,000,000.00 (Twenty-One Million Dollars)

Total – 32,010,400.00 (Thirty-Two Million, Ten Thousand, Four Hundred Dollars)

51

Injunctive and Affirmative Relief

Make whole relief for Defendants, Farrah Adams, Philip Barrocas, Mary Ewing, Marsha Cannon, to attend Mandatory Disability Discrimination Training, restructure of LBA Hospitality, LBA Investor Group, LLC, Apple Hospitality REIT, Inc. Employee Handbook to specifically address Disability Discrimination and list ADA and PWDCRA codes, PIP written for each Defendant, Farrah Adams, Philip Barrocas, Mary Ewing, Marsha Cannon, ensuring that training is completed by each Defendant, ensuring Supervisory monitoring of their progress and adherence of each Defendant and record of PIP placed in each Defendant's employee file. A letter of apology from each individual corporation, LBA Hospitality, LBAM Investment Group and Apple Hospitality REIT to the Plaintiff.

Preliminary injunctions, copying fees, and any other such further relief as the court deems just and proper.

Submitted by:

_____

Gwendolyn P. Wright

3018 Ribbon Creek Way

Spring, Texas 77389

(832)894-5861

52

<u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the Plaintiff's Motion for Summary Judgment has been sent to: Defendant

On _____.

LBA HOSPITALITY, LBAM INVESTMENT

GROUP, LLC, APPLE HOSPITALITY REIT, INC.,

PHILIP BARROCAS, MARY EWING, MARSHA CANNON,

BARBARA ISRAEL, FARRAH ADAMS

53

MEMORIAL
HERMANN

## Patient Instructions: Chest Pain

**DO NOT IGNORE CHEST PAIN OR DISCOMFORT**
**NEVER DRIVE YOURSELF WHEN YOU ARE HAVING CHEST PAIN**

If you have any of the following symptoms, seek medical attention immediately by calling 9-1-1.

- Pain that is crushing or pressing down and spreads to the arms, back, neck or jaw
- New chest pain, or a new pain that wakes you up from sleep
- Sweating, nausea or difficulty breathing due to chest pain
- Chest pain lasting more than 15 minutes at a time
- Chest pain that lasts longer than 10 minutes following a meal
- Chest pain not stopped by a Nitroglycerin tablet under the tongue
- Feel dizzy, pass out, or cannot stand up
- Lose feeling in your face, arms or legs, or feel weak quickly
- Have trouble seeing or speaking

Know your risk factors for Heart Disease
- High cholesterol
- High Blood Pressure
- Obesity
- Smoking
- Diabetes
- Lack of Physical Activity
- Family History

Family Medicine

# Palpitations

A palpitation is the feeling that your heartbeat is irregular or is faster than normal. It may feel like your heart is fluttering or skipping a beat. Palpitations are usually not a serious problem. However, in some cases, you may need further medical evaluation.



Heart

© SEIF & ASSOCIATES, INC., 2005

## CAUSES

Palpitations can be caused by:

- Smoking.
- Caffeine or other stimulants, such as diet pills or energy drinks.
- Alcohol.
- Stress and anxiety.
- Strenuous physical activity.
- Fatigue.
- Certain medicines.
- Heart disease, especially if you have a history of arrhythmias. This includes atrial fibrillation, atrial flutter, or supraventricular tachycardia.
- An improperly working pacemaker or defibrillator.

## DIAGNOSIS

To find the cause of your palpitations, your caregiver will take your history and perform a physical exam. Tests may also be done, including:

- Electrocardiography (ECG). This test records the heart's electrical activity.
- Cardiac monitoring. This allows your caregiver to monitor your heart rate and rhythm in real time.
- Holter monitor. This is a portable device that records your heartbeat and can help diagnose heart arrhythmias. It allows your caregiver to track your heart activity for several days, if needed.
- Stress tests by exercise or by giving medicine that makes the heart beat faster.

## TREATMENT

## Copy C — For EMPLOYEE'S RECORDS (See *Notice to Employee* on the back of Copy B.)

OMB NO. 1545-0008 Revised

| a Employee's SSN | | |
|---|---|---|
| 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 | | |

| 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|
| 5423.04 | |
| | 336.22 |

| b Employer ID no.(EIN) | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| 63-1272199 | 5207.49 | 336.22 |

| 5 Medicare wages and tips | 6 Medicare tax withheld |
|---|---|
| 5423.04 | 78.64 |

c Employer's name, address and ZIP code

LBAM INVESTOR GROUP, LLC
COURTYARD SHENANDOAH TX
19255 DAVID MEMORIAL DRIVE
SHENANDOAH, TX 77385
3347936855

d Control Number

e Employee's first name and initial   Last name   Suff.

GWENDOLYN P. WRIGHT
36 W BIGELOW OAK CT
THE WOODLANDS, TX 77381

f Employee's address and ZIP code

| 7 Social security tips | 8 Allocated tips | 9 |
|---|---|---|
| 215.55 | | |

| 10 Dependent care benefits | 11 Nonqualified plans | 12a Code See inst. for box 12 |
|---|---|---|
| | | DD 845.40 |

| 13 Statutory employee | 14 Other | 12b Code |
| Retirement plan | | 12c Code |
| Third-party sick pay | | 12d Code |

| TX 13-568129-6 | 5423.04 |
|---|---|
| 15 State Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax |
| 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |

VBA    Form W-2 Wage and Tax Statement    2015    Dept. of Treasury – IRS
This information is being furnished to the IRS. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

---

## Copy B — To Be Filed with Employee's FEDERAL Tax Return.

OMB NO. 1545-0008 Revised

| a Employee's SSN | | |
|---|---|---|
| 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 | | |

| 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|
| 5423.04 | |
| | 336.2 |

| b Employer ID no.(EIN) | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| 63-1272199 | 5207.49 | 336.2 |

| 5 Medicare wages and tips | 6 Medicare tax withheld |
|---|---|
| 5423.04 | 78.6 |

c Employer's name, address and ZIP code

LBAM INVESTOR GROUP, LLC
COURTYARD SHENANDOAH TX
19255 DAVID MEMORIAL DRIVE
SHENANDOAH, TX 77385
3347936855

d Control Number

e Employee's first name and initial   Last name   Suff.

GWENDOLYN P. WRIGHT
36 W BIGELOW OAK CT
THE WOODLANDS, TX 77381

f Employee's address and ZIP code

| 7 Social security tips | 8 Allocated tips | 9 |
|---|---|---|
| 215.55 | | |

| 10 Dependent care benefits | 11 Nonqualified plans | 12a Code See inst. for box 12 |
|---|---|---|
| | | DD 845.40 |

| 13 Statutory employee | 14 Other | 12b Code |
| Retirement plan | | 12c Code |
| Third-party sick pay | | 12d Code |

| TX 13-568129-6 | 5423.04 |
|---|---|
| 15 State Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax |
| 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |

VBA    Form W-2 Wage and Tax Statement    2015    Dept. of Treasury – IR
This information is being furnished to the Internal Revenue Service

---

## Copy 2 — To Be Filed with Employee's State, City, or Local Income Tax Return

OMB NO. 1545-0008 Revised

| a Employee's SSN | | |
|---|---|---|
| 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 | | |

| 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|
| 5423.04 | |
| | 336.22 |

| b Employer ID no.(EIN) | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| 63-1272199 | 5207.49 | 336.22 |

| 5 Medicare wages and tips | 6 Medicare tax withheld |
|---|---|
| 5423.04 | 78.64 |

c Employer's name, address and ZIP code

LBAM INVESTOR GROUP, LLC
COURTYARD SHENANDOAH TX
19255 DAVID MEMORIAL DRIVE
SHENANDOAH, TX 77385
3347936855

d Control Number

e Employee's first name and initial   Last name   Suff.

GWENDOLYN P. WRIGHT
36 W BIGELOW OAK CT
THE WOODLANDS, TX 77381

f Employee's address and ZIP code

| 7 Social security tips | 8 Allocated tips | 9 |
|---|---|---|
| 215.55 | | |

| 10 Dependent care benefits | 11 Nonqualified plans | 12a Code See inst. for box 12 |
|---|---|---|
| | | DD 845.40 |

| 13 Statutory employee | 14 Other | 12b Code |
| Retirement plan | | 12c Code |
| Third-party sick pay | | 12d Code |

| TX 13-568129-6 | 5423.04 |
|---|---|
| 15 State Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax |
| 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |

VBA    Form W-2 Wage and Tax Statement    2015    Dept. of Treasury – IRS

---

## Copy 2 — To Be Filed with Employee's State, City, or Local Income Tax Return

OMB NO. 1545-0008 Revised

| a Employee's SSN | | |
|---|---|---|
| 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 | | |

| 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|
| 5423.04 | |
| | 336.2 |

| b Employer ID no.(EIN) | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| 63-1272199 | 5207.49 | 336.2 |

| 5 Medicare wages and tips | 6 Medicare tax withheld |
|---|---|
| 5423.04 | 78.6 |

c Employer's name, address and ZIP code

LBAM INVESTOR GROUP, LLC
COURTYARD SHENANDOAH TX
19255 DAVID MEMORIAL DRIVE
SHENANDOAH, TX 77385
3347936855

d Control Number

e Employee's first name and initial   Last name   Suff.

GWENDOLYN P. WRIGHT
36 W BIGELOW OAK CT
THE WOODLANDS, TX 77381

f Employee's address and ZIP code

| 7 Social security tips | 8 Allocated tips | 9 |
|---|---|---|
| 215.55 | | |

| 10 Dependent care benefits | 11 Nonqualified plans | 12a Code See inst. for box 12 |
|---|---|---|
| | | DD 845.40 |

| 13 Statutory employee | 14 Other | 12b Code |
| Retirement plan | | 12c Code |
| Third-party sick pay | | 12d Code |

| TX 13-568129-6 | 5423.04 |
|---|---|
| 15 State Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax |
| 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |

VBA    Form W-2 Wage and Tax Statement    2015    Dept. of Treasury – IRS

Courtyard Shenandoah TX
Courtyard Shenandoah TX

**Direct Deposit Earnings Statement**

DD1040

79.

| Pay Date | Start Period | End Period |
|----------|--------------|------------|
| 10/30/14 | 10/13/14 | 10/26/14 |

| Earnings | | | | Taxes | | |
|---|---|---|---|---|---|---|
| Code | Rate | Hours | Amount | Code | Amount | Year To Date |
| 1200 | | 80.00 | $1,269.23 | FICA | | |
| | | | | Med | $18.41 | $36.81 |
| | | | | SS | $78.69 | $157.38 |
| | | | | Federal | | $91.59 |
| | | | | State | | |
| | | | | Local | | |
| Totals | | 80.00 | $1,269.23 | Total | $97.10 | |

| Payroll Deductions | | | Payroll Benefits | | |
|---|---|---|---|---|---|
| Code | Amount | Year To Date | Code | Amount | Year To Date |
| | | | | | |
| | | | Total | | |
| Total | | | | | |

| Wage Amounts | | |
|---|---|---|
| Net wages/period | | $1,172.13 |
| Net wages YTD | | $2,252.68 |
| Gross wages YTD | | $2,538.46 |

| Direct Deposit Information | | | Miscellaneous | |
|---|---|---|---|---|
| Bank | Account | Amount | Employee ID | WRIGHGP |
| | | | Employee SSN | |
| | | | | |
| | | | | |

GWENDOLYN P. WRIGHT
36 W Bigelow Oak Ct

The Woodlands   TX   77381

Courtyard Shenandoah TX
Courtyard Shenandoah TX
19255 David Memorial Drive

Shenandoah      TX   77385

**Direct Deposit Earnings Statement**

DD1093

*80.*

| Pay Date | Start Period | End Period |
|----------|--------------|------------|
| 12/24/14 | 12/08/14 | 12/21/14 |

| Earnings | | | | Taxes | | |
|----------|------|-------|--------|------|--------|--------------|
| Code | Rate | Hours | Amount | Code | Amount | Year To Date |
| 1200 | | 80.00 | $1,269.23 | FICA | | |
| 3100 | | | | Med | $17.81 | $109.27 |
| | | | | SS | $76.20 | $467.24 |
| | | | | Federal | | $91.59 |
| | | | | State | | |
| | | | | Local | | |
| Totals | | 80.00 | $1,269.23 | Total | $94.01 | |

| Payroll Deductions | | | Payroll Benefits | | |
|--------------------|--------|--------------|------|--------|--------------|
| Code | Amount | Year To Date | Code | Amount | Year To Date |
| PMI | $72.08 | $144.16 | | | |
| | | | Total | | |
| Total | $72.08 | | | | |

| Wage Amounts | |
|--------------|--------|
| Net wages/period | $1,103.14 |
| Net wages YTD | $6,830.24 |
| Gross wages YTD | $7,642.50 |

| Direct Deposit Information | | | Miscellaneous | |
|------|---------|--------|------|------|
| Bank | Account | Amount | Employee ID | WRIGHGP |
| | | | Employee SSN | |

GWENDOLYN P. WRIGHT
36 W Bigelow Oak Ct

The Woodlands    TX   77381

Courtyard Shenandoah TX
Courtyard Shenandoah TX
19255 David Memorial Drive

Shenandoah      TX    77385

**Direct Deposit Earnings Statement**

DD1106

*81.*

| Pay Date | Start Period | End Period |
|----------|--------------|------------|
| 01/08/15 | 12/22/14 | 01/04/15 |

| Earnings | | | | Taxes | | |
|---|---|---|---|---|---|---|
| Code | Rate | Hours | Amount | Code | Amount | Year To Date |
| 1200 | | 80.00 | $1,269.23 | FICA | | |
| | | | | Med | $16.87 | $16.87 |
| | | | | SS | $72.12 | $72.12 |
| | | | | Federal | | |
| | | | | State | | |
| | | | | Local | | |
| Totals | | 80.00 | $1,269.23 | Total | $88.99 | |

| Payroll Deductions | | | | Payroll Benefits | | |
|---|---|---|---|---|---|---|
| Code | Amount | Year To Date | | Code | Amount | Year To Date |
| GDI | $24.92 | $24.92 | | | | |
| PMI | $72.08 | $72.08 | | | | |
| VSN | $8.99 | $8.99 | | | | |
| | | | | Total | | |

| Wage Amounts | |
|---|---|
| Net wages/period | $1,074.25 |
| Net wages YTD | $1,074.25 |
| Gross wages YTD | $1,269.23 |

| Total | $105.99 |
|---|---|

| Direct Deposit Information | | | Miscellaneous | |
|---|---|---|---|---|
| Bank | Account | Amount | | |
| | | | Employee ID | WRIGHGP |
| | | | Employee SSN | |

GWENDOLYN P. WRIGHT
36 W Bigelow Oak Ct

The Woodlands   TX   77381

# Direct Deposit Earnings Statement

82.

Courtyard Shenandoah TX
Courtyard Shenandoah TX
19255 David Memorial Drive

Shenandoah TX 77385

DD1120

| Pay Date | Start Period | End Period |
|---|---|---|
| 01/22/15 | 01/05/15 | 01/18/15 |

## Earnings

| Code | Date | Hours | Amount |
|---|---|---|---|
| 1200 | | | |
| 3100 | | 40.00 | $634.61 |
| Totals | | 40.00 | $634.61 |

## Taxes

| Code | Amount | Year To Date |
|---|---|---|
| FICA | | |
| Med | $9.34 | $26.21 |
| SS | $39.95 | $112.07 |
| Federal | | |
| State | | |
| Local | | |
| Total | | $49.29 |

## Payroll Deductions

| Code | Amount | Year To Date |
|---|---|---|
| GDI | $24.92 | $49.84 |
| PMI | $72.08 | $144.16 |
| VSN | $8.99 | $17.98 |
| Total | | |

## Payroll Benefits

| Code | Amount | Year To Date |
|---|---|---|

## Wage Amounts

| | |
|---|---|
| Net wages/period | $479.33 |
| Net wages YTD | $1,553.58 |
| Gross wages YTD | $1,903.84 |

## Direct Deposit Information

| Bank | Account | Amount |
|---|---|---|
| | | $105.99 |

## Miscellaneous

| | |
|---|---|
| Employee ID | WRIGHGP |
| Employee SSN | |

83.

| Courtyard Shenandoah TX | Direct Deposit Earnings Statement | | |
|---|---|---|---|
| Courtyard Shenandoah TX | | | |
| 19255 David Memorial Drive | DD1120 | | |
| Shenandoah    TX    77385 | Pay Date | Start Period | End Period |
| | 02/19/15 | 02/02/15 | 02/15/15 |

**Earnings / Taxes**

| Code | Rate | Hours | Amount | Code | Amount | Year To Date |
|---|---|---|---|---|---|---|
| 1200 | | 80.0 | $1,974.23 | FICA | | |
| 3100 | | | | Med | $22.81 | $250.91 |
| | | | | SS | $176.20 | $1,938.20 |
| | | | | Federal | | |
| | | | | State | | |
| | | | | Local | | |
| Totals | 80.0 | $1,974.23 | Total | | $199.01 | |

**Payroll Deductions / Payroll Benefits**

| Code | Amount | Year To Date | Code | Amount | Year To Date |
|---|---|---|---|---|---|
| GDI | $24.92 | $274.12 | | | |
| PMI | $72.08 | $792.88 | | | |
| VSN | $8.99 | $98.89 | | | |
| | | | Total        Wage | Amounts | |
| | | | Net wages/period | | $1,974.23 |
| | | | Net wages YTD | | $20,320.92 |
| | | | Gross wages YTD | | $21,692.53 |
| Total | $105.99 | | | | |

**Direct Deposit Information / Miscellaneous**

| Bank | Account | Amount | Employee ID    WRIGHGP |
|---|---|---|---|
| | | | Employee SSN |

GWENDOLYN P. WRIGHT

36 W Bigelow  Oak Ct

The Woodlands    TX    77381

84.

| Courtyard Shenandoah TX | **Direct Deposit Earnings Statement** | | |
|---|---|---|---|
| Courtyard Shenandoah TX | | | |
| 19255 David Memorial Drive | DD1133 | | |
| | Pay Date | Start Period | End Period |
| Shenandoah      TX    77385 | 03/04/15 | 02/15/15 | 02/28/15 |

| Earnings | | | Taxes | | | |
|---|---|---|---|---|---|---|
| Code | Rate | Hours | Amount | Code | Amount | Year To Date |
| 1200 | | 80.0 | $1,974.23 | FICA | | |
| 3100 | | | | Med | $22.81 | $273.72 |
| | | | | SS | $176.20 | $2,114.40 |
| | | | | Federal | | |
| | | | | State | | |
| | | | | Local | | |
| Totals | 80.0 | | $1,974.23 | Total | $199.01 | |

| Payroll Deductions | | | Payroll Benefits | | | |
|---|---|---|---|---|---|---|
| Code | Amount | Year To Date | Code | | Amount | Year To Date |
| GDI | $24.92 | $299.04 | | | | |
| PMI | $72.08 | $864.96 | | | | |
| VSN | $8.99 | $107.88 | | | | |
| | | | Total        Wage | Amounts | | |
| | | | Net wages/period | | | $1,974.23 |
| | | | Net wages YTD | | | $22,295.15 |
| | | | Gross wages YTD | | | $23,666.76 |
| Total | $105.99 | | | | | |

| Direct Deposit Information | | | Miscellaneous | |
|---|---|---|---|---|
| Bank | Account | Amount | Employee ID | WRIGHGP |
| | | | Employee SSN | |

GWENDOLYN P. WRIGHT
36 W Bigelow  Oak Ct

The Woodlands     TX     77381

Treatment of palpitations depends on the cause of your symptoms and can vary greatly. Most cases of palpitations do not require any treatment other than time, relaxation, and monitoring your symptoms. Other causes, such as atrial fibrillation, atrial flutter, or supraventricular tachycardia, usually require further treatment.

## HOME CARE INSTRUCTIONS
- Avoid:
  ○ Caffeinated coffee, tea, soft drinks, diet pills, and energy drinks.
  ○ Chocolate.
  ○ Alcohol.
- Stop smoking if you smoke.
- Reduce your stress and anxiety. Things that can help you relax include:
  ○ A method that measures bodily functions so you can learn to control them (*biofeedback*).
  ○ Yoga.
  ○ Meditation.
  ○ Physical activity such as swimming, jogging, or walking.
- Get plenty of rest and sleep.

## SEEK MEDICAL CARE IF:
- You continue to have a fast or irregular heartbeat beyond 24 hours.
- Your palpitations occur more often.

## SEEK IMMEDIATE MEDICAL CARE IF:
- You develop chest pain or shortness of breath.
- You have a severe headache.
- You feel dizzy, or you faint.

## MAKE SURE YOU:
- Understand these instructions.
- Will watch your condition.
- Will get help right away if you are not doing well or get worse.

Document Released: 12/15/2001 Document Revised: 04/14/2014 Document Reviewed: 02/15/2013

ExitCare® Patient Information ©2014 ExitCare, LLC.

**Exercise:** shortage of oxygen during exercise can cause the red blood cells to sickle.

**Stress:** everyday stress from things like exams can cause red blood cells to sickle. Try to do things that relaxes you like watching your favorite show, or reading, or listen to your favorite music, or phone a friend.

**Less water:** when you don't drink enough water the blood vessels become thick and sticky and the red blood cells cannot travel through the blood vessels very easily. Drink lots of fluids.

**Cold:** blood vessels become narrow in the cold making it hard for cells to flow, which can lead to a crisis. Always keep warm.

**Infections:** can cause red blood cells to sickle. Try to maintain a high level of cleanliness. Wash hands often with soap, wash fruits and vegetables, and stay away from crowded rooms

**Smoking:** Smoking is BAD for everybody. Some people with sickle cell disease are prone to lung problems, so smoking is particularly risky and must be avoided. Always breath in fresh air.

If possible, avoid jobs that require a lot of heavy physical labor, expose you to extremes of heat or cold, or involve long work hours.

## Managing the Emotional and Social Impact

In assessing the seriousness of this disease, no one should underestimate its emotional and social impact. For the family, nothing is more heartbreaking than watching their child endure extreme pain and life-threatening medical conditions. The patient endures not only the pain itself but also the emotional strain from unpredictable bouts of pain, fear of death, and lost time and social isolation at school and work. Academic grades among patients average less than C, even in children with a low frequency of hospitalization (averaging 17 days a year).

These problems continue over the years, and both children and adults with sickle cell disease often suffer from depression. The financial costs of medical treatments combined with lost work can be very burdensome.

Any chronic illness places stress on the patient and family, but sickle cell patients and caregivers often face great obstacles in finding psychological support for the disease. Communities in which many sickle cell patients live generally lack services that can meet their needs, and professionals who work in their medical facilities are often overworked. In a study comparing patients with different kinds of long-term illnesses, those with sickle

# tramadol
(TRAM a dol)

## ConZip, Rybix ODT, Ryzolt, Ultram, Ultram ER

## What is the most important information I should know about tramadol?
You should not take tramadol if you have used alcohol, sedatives, tranquilizers, or narcotic medications within the past few hours.

**Tramadol can slow or stop your breathing.** Never use this medicine in larger amounts, or for longer than prescribed. Do not crush, break, or open an extended-release pill. Swallow it whole to avoid exposure to a potentially fatal dose. **Tramadol may be habit-forming, even at regular doses.** Never share this medicine with another person, especially someone with a history of drug abuse or addiction. Keep the medication in a place where others cannot get to it.

**MISUSE OF PAIN MEDICATION CAN CAUSE ADDICTION, OVERDOSE, OR DEATH, especially in a child or other person using the medicine without a prescription.**

Tell your doctor if you are pregnant. **Tramadol may cause life-threatening addiction and withdrawal symptoms in a newborn.**

**Do not drink alcohol.** Dangerous side effects or death can occur when alcohol is combined with tramadol.

## What is tramadol?
Tramadol is a narcotic-like pain reliever.

Tramadol is used to treat moderate to severe pain.

The **extended-release form** of this medicine is for around-the-clock treatment of pain. This form of tramadol is **not** for use on an as-needed basis for pain.

Tramadol may also be used for purposes not listed in this medication guide.

## What should I discuss with my healthcare provider before taking tramadol?
You should not take tramadol if you are allergic to it, or if you have:
- severe asthma or breathing problems;
- a blockage in your stomach or intestines;
- if you have recently used alcohol, sedatives, tranquilizers, or narcotic medications.

**Seizures have occurred in some people taking tramadol.** Talk with your doctor about your seizure risk, which may be higher if you have:
- a history of head injury, epilepsy or other seizure disorder;
- a history of drug or alcohol addiction;
- a metabolic disorder; or
- if you are also using certain medicines to treat migraine headaches, muscle spasms, depression, mental illness, or nausea and vomiting.

To make sure tramadol is safe for you, tell your doctor if you have:
- liver or kidney disease;
- a stomach disorder; or
- a history of drug abuse, alcohol addiction, mental illness, or suicide attempt.

Tramadol is more likely to cause breathing problems in older adults and people who are severely ill, malnourished, or otherwise debilitated.

FDA pregnancy category C.  It is not known whether tramadol will harm an unborn baby.  **Tramadol may cause breathing problems, behavior changes, or life-threatening addiction and withdrawal symptoms in your newborn if you use the medication during pregnancy.**  Tell your doctor if you are pregnant.

Tramadol can pass into breast milk and may harm a nursing baby.  You should not breast-feed while you are taking tramadol.

Do not give this medication to anyone younger than 16 years old without the advice of a doctor.  **Ultram ER** should not be given to anyone younger than 18 years old.

**Rybix ODT** may contain phenylalanine.  Talk to your doctor before using this form of tramadol if you have phenylketonuria (PKU).

## How should I take tramadol?

Follow all directions on your prescription label.  Tramadol can slow or stop your breathing, especially when you start using this medicine or whenever your dose is changed.  **Never take tramadol in larger amounts, or for longer than prescribed.**  Tell your doctor if the medicine seems to stop working as well in relieving your pain.

Tramadol may be habit-forming, even at regular doses.  Never share this medicine with another person, especially someone with a history of drug abuse or addiction.  **MISUSE OF PAIN MEDICATION CAN CAUSE ADDICTION, OVERDOSE, OR DEATH, especially in a child or other person using the medicine without a prescription.**  Selling or giving away tramadol is against the law.

Stop taking all other around-the-clock narcotic pain medications when you start taking tramadol.

Tramadol can be taken with or without food, but take it the same way each time.

Do not crush, break, or open an extended-release tablet or capsule (**ConZip, Ryzolt, Ultram ER**). Swallow it whole to avoid exposure to a potentially fatal dose.

**Never crush or break a tramadol pill to inhale the powder or mix it into a liquid to inject the drug into your vein.**  This practice has resulted in death with the misuse of tramadol and similar prescription drugs.

To take tramadol **orally disintegrating tablets** (Rybix ODT):
- ·Keep the tablet in its blister pack until you are ready to take it.  Use dry hands to remove the tablet and place it in your mouth.
- Do not swallow the tablet whole.  Allow it to dissolve in your mouth without chewing. If desired, you may drink liquid to help swallow the dissolved tablet.

If you use the tramadol extended-release tablet, the tablet shell may pass into your stools (bowel movements).  This is normal and does not mean that you are not receiving enough of the medicine.

**Do not stop using tramadol suddenly**, or you could have unpleasant withdrawal symptoms.  Ask your doctor how to safely stop using tramadol.

Store at room temperature away from moisture and heat.

Keep track of the amount of medicine used from each new bottle.  Tramadol is a drug of abuse and you should be aware if anyone is using your medicine improperly or without a prescription.

## What happens if I miss a dose?

Since tramadol is used for pain, you are not likely to miss a dose.  Skip any missed dose if it is almost time for your next scheduled dose.  **Do not** use extra medicine to make up the missed dose.

## What happens if I overdose?

Seek emergency medical attention or call the Poison Help line at 1-800-222-1222.  **A tramadol overdose can be fatal, especially in a child or other person using the medicine without a prescription.**  Overdose symptoms may include

slow breathing and heart rate, severe drowsiness, cold and clammy skin, and fainting.

## What should I avoid while taking tramadol?

**Do not drink alcohol.** Dangerous side effects or death can occur when alcohol is combined with tramadol. Check your food and medicine labels to be sure these products do not contain alcohol.

Tramadol may impair your thinking or reactions. Avoid driving or operating machinery until you know how this medicine will affect you. Dizziness or severe drowsiness can cause falls or other accidents.

## What are the possible side effects of tramadol?

Get emergency medical help if you have any of these **signs of an allergic reaction:** hives; difficulty breathing; swelling of your face, lips, tongue, or throat.

Call your doctor at once if you have:

- seizure (convulsions);
- weak or shallow breathing;
- **high levels of serotonin in the body**--agitation, hallucinations, fever, fast heart rate, overactive reflexes, nausea, vomiting, diarrhea, loss of coordination, fainting; or
- **severe skin reaction**--fever, sore throat, swelling in your face or tongue, burning in your eyes, skin pain, followed by a red or purple skin rash that spreads (especially in the face or upper body) and causes blistering and peeling.

Common side effects may include:

- headache, dizziness, drowsiness, tired feeling;
- constipation, diarrhea, nausea, vomiting, stomach pain; or
- feeling nervous or anxious.
- itching, sweating, flushing (warmth, redness, or tingly feeling).

This is not a complete list of side effects and others may occur. Call your doctor for medical advice about side effects. You may report side effects to FDA at 1-800-FDA-1088.

## What other drugs will affect tramadol?

**Taking this medicine with other drugs that make you sleepy or slow your breathing can cause dangerous or life-threatening side effects.** Ask your doctor before taking tramadol with a sleeping pill, narcotic pain medicine, muscle relaxer, or medicine for anxiety, depression, or seizures.

Many drugs can interact with tramadol, including prescription and over-the-counter medicines, vitamins, and herbal products. Not all possible interactions are listed here. Tell each of your health care providers about all medicines you use now and any medicine you start or stop using.

## Where can I get more information?

Your pharmacist can provide more information about tramadol.

Remember, keep this and all other medicines out of the reach of children, never share your medicines with others, and use this medication only for the indication prescribed.

Every effort has been made to ensure that the information provided by Cerner Multum, Inc. ('Multum') is accurate, up-to-date, and complete, but no guarantee is made to that effect. Drug information contained herein may be time sensitive. Multum information has been compiled for use by healthcare practitioners and consumers in the United States and therefore Multum does not warrant that uses outside of the United States are appropriate, unless specifically indicated otherwise. Multum's drug information does not endorse drugs, diagnose patients or recommend therapy. Multum's drug information is an informational resource designed to assist licensed healthcare practitioners in caring for their patients and/or to serve consumers viewing this service as a supplement to, and not a substitute for, the expertise, skill, knowledge and judgment of healthcare practitioners. The absence of a warning for a given drug or drug combination in no way should be construed to indicate that the drug or drug combination is safe, effective or appropriate for any given patient.

Please list name of a friend or relative that we can contact who knows about your illnesses, injuries, or conditions and can help you with your claim or case:

1. Mother – Mary Parker  713-884-5851
2. Sons – Mark E. and Joshua C. Wright  832-292-1997
3. Sister – Jocelynne Feddis 713-885-7871
4. Niece – Christina Dennis 832-260-1839
5. Nephew – Derrick Dennis  405-568-9900
6. Cousin – Michelle Smith  713-826-7219
7. Cousin – Sharon Smith  713-734-1324
8. Praise & Worship Leader – Isiah & Jessica Rangel  713-870-7481
9. Church Member – Hilda & Steve Sachelbrant  832-482-8806
10. Pastor – Frankie Meszzapeka  (281) 978-4678
11. Prayer Ministry Leader – Pastor Duane 281-978-4678
12. Prayer Partner & Office Manager – Linda Locklear  281-789-7500
13. Co-Worker – Sara Alaniz  281-789-7500
14. Co- Worker – Glenn Perry  281-789-7500
15. Co- Worker – Paige Hill  281-789-7500
16. Co-Worker – Apostle Joan Hunter (Owner of Joan Hunter Ministries  281-789-7500
17. Supervisor – Melody Barker  281-789-7500
18. Insperity Representative – Karla 808-888-8842
19. Friend – Carolyn Vance  713-631-8319
20. Friend – Herman Vance III  713-631-8319
21. Friend – Earnestine Champine  713-633-3736
22. Eddie Carter – Uncle  713-702-0600
23. Friend – Sugar Trask  409-789-9631
24. Friend – Jana Danforth832-407-0806
25. Friend – Jeanine Green
26. Niece – Sheterra Bowles

LBA WEBMAIL

Back    Compose    Reply    Reply all    Forward    Delete    Print

**Inbox**

| | |
|---|---|
| Any Luck | |
| Bistro Queen | |
| Catering Menu | |
| Chenille Mody | 6 |
| Dan Myers | |
| Dell Inc | |
| Goolah | |
| Faust Distributing | 2 |
| Food & Beverage ... | 14 |
| Food & Beverage ... | 4 |
| Glynel | |
| Gina schaut | |
| Gwen Wright | 9 |
| Hardies | 3 |
| Health Department | 1 |
| Investor | |
| ai trust | |
| Keith McCabe | 6 |
| Kiki-Payroll | 1 |
| Larry McKenna | |
| Linda Thorne | |
| Mary Ewing | 7 |
| Melissa Castro | 7 |
| MGS | 1 |
| Pepsi | 2 |
| Philip | 1 |
| S Bus Forms | |
| Salon Trust | |

## Associate complaint

From    CY Shenandoah F&B

To    Keith McCabe    , CY Shenandoah AGM    , cy

Date    Mon 05:47

Hello Keith,

I am writing this official complaint on behalf of Euridice.

When I arrived this morning, Euridice was almost in tears.  She said that she
instructions and reminders on the board in the kitchen that were not followe

1. Soup and AuJus left in the warmer on the front end.  Had to be thrown a
2. Dirty dishes left in the sink and on the sink line, which included the Vitar
3. Starbucks Machine left dirty.  Third time that Euridice or myself had to c
4. Juice cooler not re-stocked.  I left a message on the board for this to be
5. AM sandwiches or parfaits were not made.  I left a message reminding F
6. No bacon trays prepped or wrapped for AM shift.
7. Grill left dirty.
8. Trash not taken out.
9. To Go items (plasticware) not re-filled.
10. Bar stools left at the counter.
11. Sanitizer buckets left at the front-end.

This has been a continious problem.  These two Associates are completely i
that the two young ladies are unprofessional, disrespectful, not team players
a means of protecting themselves from any actions being taken.

I am put in a position to allow these actions and many more not mentioned
Raquel) are becoming increasingly inpolite to all other Bistro Associates and
encouraged him to use the charts and logs even if Ximena or Raquel did no

I am requesting that we hire new Associate ASAP and Ximena and Raquel b

Sincerely,

Gwendolyn P. Wright
Bistro Manager

LR. WEBMAIL

Back    Compose      Reply      Reply all    Forward    Delete      Print

**Inbox**

Amy Luck

Bistro Orders

Catering Menu

Chenille Mody          6

Dan Myers

DAR Pro

Ecolab

Faust Distributing      1

Food & Beverage...      4

Food & Beverage-...     8

Glazier                1

Greg Lambert

Gwen Wright            13

Hardies                4

Health Department      1

Inventory

pil works

Keith McCabe           6

Kiki-Payroll           1

Lazy M Farms

Linda Dewalt

Mary Ewing             8

Melissa Castro         10

MGS                    1

Pepsi                  1

Philip

Si-Bar Sweets

Silver Eagle

## List of names and info.

From    **CY Shenandoah F&B**
To      gwendolynwright@hotmail.com
Date    Today 5:19 am

This is a list of names and the information that I have been verbally given a

1.  Westen Deets - states that Barbara is constantly putting my work down
doesn't know how much more he can take.  Weston has witnessed the fact
desire to report the situation, but fears losing his job.

2.  Rachel Calahan - states that Barbara confides in her often and that she
really sick.  Rachel states that Barbara is pitting all of the employees agains
stated that Barbara has asked her several times to go into the kitchen, pret

3.  Kiana Braga - new hire that witnessed Babara speaking to me in front of
angry that I had allowed a guests to use cooking utensils and was bery unp

4.  Jessie - (Majesty staff member) had words with Barbara on their first me
saw another Majesty staff member approximately one hour later and called
one staff member from Majesty on the property.  She then said that she ha
her and she said that Barbara was flat out lieing.  I went back to Barbara an
reported her.

5.  Alvin and Yolanda - (Majesty statt members) will state that they have w
by capabilites as a Manager.

6.  Chenille Modey - Sales Rep. that quit after Barbara came to the hotel.  S
She and Barbar had words on several occassions.  She told both Chenille m
this, she then called me into her office and screamed at me calling me a lia

7. Leticia - housekeeping staff that has told me that she sees how hard I wo
me to help on several occassions.

8.  Mark - Night audit has spoken with me at length about the first report a
witnessed. Has spoken to me about my disability and said that he thinks th

9. Chirs Landry -was brought in after my report the first time to check the l
things going on to someone other than LBA Human resources.  She witness

10. Mary Ewing - LBA Food and Beverage Director who was here from the b
Management team.  She knows of my disability and I sent her pictures of m
Mary will probably not want to talk because she fears for her job.

11. Keith McCabe - Acting GM that I reported for writing me up without bein
length about LBA and what took place during he stay at the hotel.

12. Amy Luck - First GM that was fired after two months.  Amy will speak to

13.  Michelle Bolding-Smith - cousin who I have spoken to at length about t

14.  Mark Wright, Joshua Wright and Mary Parker - mother and sons who ha

15.  Marsha - Human Resources Director for LBA - has spoken to me at leng
me know the outcome, but knows how stressful of a situation the hotel is u

Back     Compose     Reply     Reply all     Forward     Delete     Prir

**Inbox**

| | | |
|---|---|---|
| Amy Lusk | | |
| Bistro Orders | | |
| Catering Menu | | |
| **Chenille Mody** | **6** | |
| Dan Myers | | |
| DAR Pro | | |
| EcoLab | | |
| **Faust Distributing** | **2** | |
| **Food & Beverage...** | **14** | |
| **Food & Beverage-...** | **4** | |
| Glazier | | |
| Greg Lambert | | |
| **Gwen Wright** | **9** | |
| **Hardies** | **3** | |
| **Health Department** | **1** | |
| Inventory | | |
| Jill Welsh | | |
| **Keith McCabe** | **6** | |
| **Kiki-Payroll** | **1** | |
| Lazy M Farms | | |
| Linda Dewalt | | |
| **Mary Ewing** | **7** | |
| **Melissa Castro** | **7** | |
| **MGS** | **1** | |
| **Pepsi** | **2** | |
| **Philip** | **1** | |
| S-Bar Sweep | | |
| Silver Eagle | | |

### Re: Ximena Arevalo

| | |
|---|---|
| From | CY Shenandoah F&B |
| To | Shenandoah Courtyard |
| Cc | CY Shenandoah FB |
| Date | Thu 14:50 |
| Priority | **Highest** |

Okay,

Thanks,

Gwen

On 12/10/2014 9:23 pm, Shenandoah Courtyard by Marriott - AGM wrote:

> Gwen,
>
> Ximena wants to make sure you get her schedule
> note for you in the admin area
>
> Thank you
>
> Melissa Castro
>
> Assistant General Manager
>
> Courtyard by Marriott Houston North
>
> Shenandoah Texas 77385
>
> e. cyshenandoahagm@lbaproperties.com
>
> p. 936-273-6600
>
> f. 936-273-6601

L    WEBMAIL

Back    Compose    Reply    Reply all    Forward    Delete    Prir

**Inbox**

Amy Lusk

Bistro Orders

Catering Menu

**Chenille Mody**

Dan Myers

DAR Pro

EcoLab

**Faust Distributing**

**Food & Beverage...**

**Food & Beverage-...**

Glazier

Greg Lambert

**Gwen Wright**

**Hardies**

**Health Department**

Inventory

Jill Welsh

**Keith McCabe**

**Kiki-Payroll**

Lazy M Farms

Linda Dewalt

**Mary Ewing**

**Melissa Castro**

**MGS**

**Pepsi**

**Philip**

S-Bar Sweep

Silver Eagle

# Meetings and events

| | |
|---|---|
| From | **CY Shenandoah F&B** |
| To | Chenillem@lbaproperties.com        , keithm@lba |
| Cc | Cyshenandoahfb@lbaproperties.com |
| Date | **Sun 07:44** |

Hello Chenille,

i would like to run something by you and see if you and Keith are willing to

During this next meeting on dec.10th, I would like support in showcasing co

i am requesting a small budget for serving dishes and decorations.  The ser

With such a limited amount of time, I will need to shop today and begin get

Does the hotel have a camera? Pictures of the preparation and set up from

The earning potential for selling the hotel rooms will possibly increase if we

i will need an answer today from Keith and a  budget.  Will this come out of

Waiting to hear back.


Gwendolyn P. Wright

**LBA** WEBMAIL

Back    Compose    Reply    Reply all    Forward    Delete    Print

### Inbox

| | |
|---|---|
| Amy Lusk | |
| Bistro Orders | |
| Catering Menu | |
| Chenille Mody | 6 |
| Dan Myers | |
| DAP Pro | |
| Ecolab | |
| Faust Distributing | 1 |
| Food & Beverage... | 4 |
| Food & Beverage-... | 8 |
| Glazier | 1 |
| Greg Lambert | |
| Gwen Wright | 13 |
| Hardies | 4 |
| Health Department | 1 |
| Inventory | |
| Jill Walsh | |
| Keith McCabe | 6 |
| Kiki-Payroll | 1 |
| Lary M Farris | |
| Linda Dewall | |
| Mary Ewing | 8 |
| Melissa Castro | 19 |
| MGS | 1 |
| Pepsi | 1 |
| Philip | |
| S-Bar. Sweep | |
| Silver Style | |

## Cleaning Towels

| | |
|---|---|
| From | CY Shenandoah F&B |
| To | cyshenandoah@lbaproperties.com |
| Cc | CY Shenandoah FB |
| Date | Today 8:43 am |

Hi Barbara,

I was trained to use only disposable towels in the Bistro.  Due to the fact th
chance of germs or bacteria being transferred.  The towels are to be discard
discolored.

If this is not your understanding of the towels or your training please let me
from.

Thanks,

Gwen



**MAJESTY**
HOSPITALITY STAFFING
. . . . . . . . . . . . . . . . . . . . . . . . .

CHANDRA THOMPSON
STAFFING OPERATIONS MANAGER

701 N. POST OAK ROAD, SUITE 420
HOUSTON, TEXAS 77024
CELL: 713-545-4940
TEL: 713-682-1828
FAX: 713-316-0073
chandra@majestyhospitalitystaffing.com
www.MajestyHospitalityStaffing.com

This is who you need to speak with regarding Staffing for Parties going forward.

— Westin